A91A0567. CSX TRANSPORTATION, INC. v. LEVANT.
(410 SE2d 299)

COOPER, Judge.

This case arises out of an action for damages under the Federal Employer's Liability Act ("FELA"). The case was tried before a jury, and the jury returned a general verdict in favor of plaintiff for one million dollars. Defendant, CSX Transportation, Inc., ("CSX"), appeals from the judgment entered on the jury verdict.

Plaintiff had worked as a switchman in a rail yard in Savannah, Georgia since 1972. His job required him to climb onto train cars and to do occasional lifting and pushing and pulling of objects of 100 pounds or more. In 1986, he was injured when one of the train cars on which he was riding derailed and came to a sudden stop. When plaintiff attempted to clear some of the train cars involved in the derailment, he experienced pain in his left shoulder, back and legs. He was taken to the hospital where he was treated and released. Plaintiff entered into a course of treatment with several doctors who prescribed medication for his pain. He was subsequently treated by an orthopedic surgeon who performed tests which revealed that plaintiff had a herniated disc. When plaintiff's pain did not subside, he underwent surgery for the removal of his herniated disc.

1. Defendant's first enumeration of error is that the verdict was excessive and that the trial court erred in denying CSX's motion for a new trial on the issue of damages. The only damages recoverable in a FELA action are compensatory damages. A FELA plaintiff can recover special damages for past and future lost wages and medical expenses and general damages for pain and suffering. *Central of Georgia R. Co. v. Swindle*, 260 Ga. 685, 686 (398 SE2d 365) (1990). Punitive damages are not recoverable. Id. " '[T]he jury's determination of the amount of damages to be awarded is otherwise inviolate,

"absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial. . . . (Cits.)" [Cit.]' " *CSX Transp. v. Darling*, 189 Ga. App. 719 (1) (377 SE2d 217) (1988). Plaintiff established at trial that through the date of trial his lost wages totalled $46,342.97 and that his medical expenses totalled $11,694.79. Plaintiff also testified that although he has returned to work at a different job, he continues to lose approximately two to three days each month as a result of his injury and for which he is not compensated. Plaintiff also testified that because he still experiences pain, he is unable to work at his former job in the rail yard and is unsure how much longer he will be able to work for the railroad. Plaintiff stated that he is not allowed to take pain medication while at work, that he is afraid to make certain moves at work because of his pain, and that he is unable to do certain work around the house. Several employees of CSX testified that railroad work has become more physically demanding because of decreases in manpower. Those employees also testified that plaintiff moves with less ease, has difficulty throwing switches, and often has to have help from others in performing certain jobs. Plaintiff's wife testified that plaintiff "is a different man"; that he is no longer able to play sports, keep up his garden or paint the house; that he is often irritable and depressed and has no patience with their children. Plaintiff's doctor testified that plaintiff has a ten percent permanent partial impairment; that due to his injury, plaintiff will probably continue to experience some pain which will make it difficult for him to do the type of work that he normally does; that because of plaintiff's injury, he is more vulnerable to injury in the future; and that he found plaintiff to be "under expressive" of the pain he was experiencing. " ' "Before the verdict will be set aside on the ground that it is excessive, where there is no direct proof of prejudice or bias, the amount thereof, when considered in connection with all the facts, must shock the moral sense, appear '(exorbitant),' 'flagrantly outrageous,' and 'extravagant.' 'It must be monstrous indeed and such as all mankind must be ready to exclaim against at first blush.' It must carry its death warrant upon its face." (Cits.)' [Cit.]" *CSX Transp. v. Darling*, supra at 721. Given the nature of plaintiff's injury (back), the type of work for which plaintiff is employed (physical), the fact that plaintiff has a permanent disability rating, will continue to have pain in the future, and is more vulnerable to injury in the future, we cannot conclude that the jury's award of one million dollars "shocks the judicial conscience." Although CSX relies on *Central of Ga. R. Co. v. Swindle*, supra, we find that case to be distinguishable. In *Swindle*, the plaintiff was a computer operator, rather than a physical laborer, who suffered a shoulder injury, but there was no permanent or occupational disability. There was no evi-

dence that plaintiff would need further surgery, and plaintiff's physicians testified that his neck and shoulder pain would diminish as plaintiff learned to avoid moving his arm in an overhead manner. As noted in *Swindle*, "in determining whether a trial court abuses its discretion in refusing to order a new trial on the issue of damages in an FELA case, 'the appellate court must make its own "detailed appraisal of the evidence bearing on damages." *Grunenthal v. Long Island R. Co.*, 393 U. S. 156, 159 (89 SC 331, 333, 21 LE2d 309) (1968).' [Cit.]" *Central of Ga. R. Co. v. Swindle*, supra at 686. Our "detailed appraisal of the evidence bearing on damages" does not lead us to the conclusion that the trial court abused its discretion in denying CSX's motion for new trial on the issue of damages.

2. CSX also contends that the trial court erred in failing to exclude prejudicial comments made by plaintiff's counsel during closing argument. The trial court granted CSX's motion in limine to exclude any negative references about the railroad and directed plaintiff's counsel not to make any derogatory remarks about CSX or counsel for CSX. During his closing remarks to the jury, plaintiff's counsel made certain references to CSX's trains running through towns with carloads of gas and suggested that the railroad did not employ enough people to maintain the tracks. Plaintiff's counsel also made the following statement during his closing argument: "That's the way they operate. They're not going to put nobody to do — to keeping up these tracks or anything else as long as you people don't come down here and halfway compensate somebody. If all you do is give them halfway compensation, and you don't fully compensate them, you can bet they ain't going to never keep it up." We agree with CSX and find that plaintiff's argument was improper in that it suggested to the jury that damages be awarded to punish the railroad. See *Central of Georgia R. Co. v. Swindle*, supra at 688, fn. 1 (Plaintiff's counsel stated therein: "(W)e ask that when you're deciding what to do, that you're not so fair to the railroad that you encourage . . . their misplaced priorities. We ask that you not be so fair to the railroad that you encourage this kind of treatment of the employees.") We have reviewed the entire record, including those instances during the trial where CSX alleges that plaintiff's attorney made prejudicial comments. While we agree that many of plaintiff's attorney's remarks were improper, we find that, considering those remarks in the context of the trial as a whole, the remarks did not require the trial court to declare a mistrial. We cannot conclude that under the factual circumstances presented in this case the improper argument and references made by plaintiff's counsel "permeated the trial and resulted in the jury's rendering a verdict based, at least in part, on punitive damages." *Swindle*, supra at 687. In contrast to *Swindle*, we conclude the verdict in this case can be logically explained as having resulted from the damages suf-

fered by plaintiff (see Division 1) and not from a punitive cause. CSX's second enumeration of error is without merit.

3. In its third enumeration of error, CSX contends that the trial court erred in excluding expert testimony from a certified public accountant about present value and testimony about the railroad retirement taxes paid by plaintiff. CSX sought to have its expert witness explain how certain present sums of money would yield certain future amounts of money. The trial court refused to allow the testimony, finding that this method usurped the function of the jury, which was to make an award and then reduce it to present value. The trial court did not prohibit the witness from testifying about present value altogether, but prohibited him from presenting the evidence "backwards." The trial court also found that the witness' testimony was analogous to the kind of annuity testimony which was specifically disallowed in *Gusky v. Candler Gen. Hosp.*, 192 Ga. App. 521 (3) (385 SE2d 698) (1989). (Expert testimony as to annuities which could be purchased with the settlement proceeds is irrelevant as it is antithetical to the requirement . . . that future pecuniary damages are to be reduced by the jury to the present value.) Although *Gusky* was not an FELA case, we find the principles espoused therein to be applicable to this case. If the evidence had been admitted, the jury could have confused their function, which is not to determine what a present sum of money will yield in the future, but to award a certain sum and reduce the award to present value. " 'Evidence which is relevant may be excluded because its probative worth or value is outweighed by its tendency to confuse the issues, or the jury.' [Cit.]" *Hendricks v. Southern Bell Tel. &c. Co.*, 193 Ga. App. 264 (4) (387 SE2d 593) (1989). We find no error with the trial judge's exclusion of the evidence.

The trial court also refused to admit any evidence relating to the amount of railroad retirement taxes withheld from plaintiff's income. CSX contends that it should have been allowed to show plaintiff's net income as reduced by his railroad retirement taxes. It is clear that CSX sought to mitigate damages by having the jury consider plaintiff's payment of railroad retirement taxes. " 'The Railroad Retirement Act is substantially a Social Security Act for employees of common carriers. . . . The benefits received under such a system of social legislation are not directly attributable to the contributions of the employer so they cannot be considered in mitigation of the damages caused by the employer.' " *Eichel v. N. Y. Central R. Co.*, 375 U. S. 253, 254 (84 SC 316, 11 LE2d 307) (1963) citing *New York, N. H. &c. R. Co. v. Leary*, 204 F2d 461 (1st Cir. 1953). The taxes paid by plaintiff into the railroad retirement fund are to fund his future retirement and are paid directly to him upon his retirement. Since the railroad retirement taxes would ultimately be paid directly to plaintiff upon

his retirement, we find no error with the trial court's exclusion of this evidence or with the trial court's refusal to instruct the jury that plaintiff's net income means gross income minus all taxes including railroad retirement taxes.

4. CSX contends that the trial court erred in allowing plaintiff to call employees of the railroad for the purpose of cross-examination and in not permitting CSX to examine those witnesses during plaintiff's case-in-chief. OCGA § 24-9-81 allows either party in a civil case to call for the purpose of cross-examination the opposite party or any agent of the opposite party. CSX argues that since the witnesses were either friends of plaintiff, co-workers, or fellow union members, the railroad was denied its constitutional right to a fair trial by not having the opportunity to examine those witnesses. We disagree. OCGA § 24-9-81 does not require the party calling the witness for cross-examination to establish that the witness is hostile. See *Henderson v. Glen Oak, Inc.*, 179 Ga. App. 380 (2) (346 SE2d 842) (1986). All of the witnesses called by plaintiff for cross-examination were employees of the railroad and "subject to all of the pressures and possible prejudices in favor of the defendant which that relationship would tend to engender." *Atlanta Joint Terminals v. Knight*, 98 Ga. App. 482 (2) (106 SE2d 417) (1958). "Under the provisions of OCGA § 24-9-81 appellant had a right to cross-examine [the employees of the railroad] as [agents] of the opposite party." *Henderson v. Glen Oak, Inc.*, supra. Furthermore, it was within the trial court's discretion whether to allow CSX to question the witnesses at the end of plaintiff's cross-examination, or to require CSX to call the witnesses as part of its case. *Colwell v. Voyager Cas. Ins. Co.*, 251 Ga. 744 (1), fn. 5 (309 SE2d 617) (1983). Although the trial court did not permit CSX to examine the witnesses at the conclusion of plaintiff's examination, the court gave CSX the opportunity to call the witnesses as part of its case. Therefore, the trial court did not deny CSX the opportunity to examine the witnesses, and we do not find that the trial court's exercise of its discretion and application of OCGA § 24-9-81 denied CSX a fair trial.

5. In its final enumeration of error, CSX contends that the trial court erroneously instructed the jury to calculate any future lost earnings over plaintiff's life expectancy while declining to instruct the jury that a person may not work all the years of his life. CSX argues that since a person may not work all of the years of his life, lost earnings must be calculated based on a person's work-expectancy as opposed to his life expectancy. The trial court charged the jury as follows: "If you find that the Plaintiff's earnings will be permanently reduced in this case or under the evidence in this case, then lost future earnings, like lost past earnings, will be determined on the basis of the earnings the Plaintiff will lose, and there must be some evidence before you as

to the amount of such earnings. In doing this, you could take into consideration that old age generally reduces the capacity to labor and earn money. You may also take into consideration the proposition that the earning capacity of Plaintiff could have increased during some later periods of his life, if such is authorized by the evidence. In considering this question, you should also consider the life expectancy of the Plaintiff. And taking the factors I've just mentioned in consideration as to earning capacity and life expectancy, you should determine what his average annual loss of future earning would probably have been and apply them to his life expectancy." " 'It is a fundamental rule in Georgia that jury instructions must be read and considered as a whole in determining whether the charge contained error.' [Cit.]" *Department of Transp. v. Hillside Motors*, 192 Ga. App. 637 (3) (385 SE2d 746) (1989). After considering the court's charge as a whole we find no error.

6. Prior to the hearing on CSX's motion for new trial, plaintiff submitted affidavits from all but one of the jurors in this case stating in effect that they were not biased by any of plaintiff's counsel's remarks; that they did not attempt to punish the railroad with their verdict; and that they felt their verdict of one million dollars was reasonable compensation for plaintiff's injury. The record does not reflect that CSX objected to the trial court's consideration of the affidavits at the time of the motion for new trial. Nor did CSX enumerate as error the trial court's consideration of the affidavits. " '[I]t is well established law that enumerations of error which raise questions for the first time on appeal present nothing for decision.' [Cit.]" *Mitchell v. Southern Gen. Ins. Co.*, 194 Ga. App. 218 (1) (390 SE2d 79) (1990).

For the foregoing reasons, the judgment of the trial court is affirmed.

*Judgment affirmed. McMurray, P. J., Banke, P. J., Carley and Pope, JJ., concur. Sognier, C. J., Birdsong, P. J., Beasley and Andrews, JJ., dissent.*

BIRDSONG, Presiding Judge, dissenting.

As my colleagues in the majority would affirm this judgment, I am compelled to dissent.

The jury in this case returned a verdict in favor of plaintiff for one million dollars, although plaintiff at trial established lost wages through the date of trial of $46,342.97 and medical expenses of $11,694.79. Appellant also testified regarding the scope of pain he continues to suffer, his continued loss of approximately two to three days of work each month for which he is not compensated, and the effect of the injury on his ability to perform his former job in the rail yard and on his ability to enjoy the pleasures of life to the same extent as before injury.

1. "Damages recoverable in an FELA action are compensatory only. [Cit.] The FELA plaintiff can recover special damages for past and future lost wages and medical expenses, as well as general damages for pain and suffering. [Cits.] In arriving at its verdict, the jury should take into consideration the plaintiff's occupational disability and its impairment on his earning power. [Cit.] However, punitive damages are not allowable. [Cit.] Federal courts have held that in determining whether a trial court abuses its discretion in refusing to order a new trial on the issue of damages in an FELA case, 'the appellate court must make its own "detailed appraisal of the evidence bearing on damages." [Cit.]' [Cit.] The jury's determination of the amount of damages to be awarded in an FELA case has been held to be 'otherwise inviolate, "absent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or *another improper cause invaded the trial.*"'" *Central of Ga. R. Co. v. Swindle*, 260 Ga. 685, 686 (398 SE2d 365). Applying this precedent to the facts before it, the Supreme Court in *Swindle*, supra, concluded that the jury verdict in the case was a verdict that could only be "logically explained as having resulted from a punitive cause, which is an improper cause in FELA cases." Id. Therefore, it was concluded that the jury impermissibly intended "at least a portion of the verdict to have the effect of punishing the defendant and influencing its conduct rather than compensating the plaintiff for his injuries." Id.

In arriving at its determination in *Swindle*, the majority considered *CSX Transp. v. Darling*, 189 Ga. App. 719 (377 SE2d 217) and rejected it as controlling; notwithstanding the vigorous protest of Justice Benham in dissent who asserted "if the verdict in this case is wrong [which the majority found it was], then the verdict in *Darling* was wrong." Id. at 689.

The verdict in *Swindle* (award of $875,000 where total special damages consisted of $32,218.82 in medical expenses and $27,090 in lost income; also appellant testified to his inability to enjoy life's pleasures to the same degree as before injury) is similar but not as pronounced as the degree of disparity between amount of award and the established amount of special damages and lost wages to the verdict in the case sub judice. Nevertheless, the Supreme Court did not attempt to support its determination exclusively on this factor. Rather, the court in *Swindle* stated, "a review of the transcript shows a *pervasive and persistent attempt* on the part of the plaintiff to establish improper motive and anti-union sentiment on the part of the defendant railroad, 'suggesting that damages be awarded . . . for the purpose of punishing the defendant.' Based upon our 'detailed appraisal of the evidence bearing on damages,' we can only conclude that this 'improper cause' permeated the trial and resulted in the

jury's rendering a verdict based, at least in part, on punitive damages." *Swindle*, supra at 687. This conclusion was expressly stated to be "supported by the pejorative nature of plaintiff's closing argument," which the court excerpted for the benefit of lower court guidance. Id. at 687, n. 1.

At the outset, we note that during his opening statement plaintiff's counsel informed the jury that he had worked for a railroad (Central and not Seaboard). Subsequently, as in *Swindle*, plaintiff's counsel during closing argument made repeated, express or implicit, pejorative statements in the presence of the jury, as follows: "And bless his old heart, he's got thirteen men to cover two hundred miles of track. Now, that ain't *my* fault. That's not *my* fault when they [the railroad] come running through these towns with these carloads of gas, and it rocking back and forth, because they got thirteen men to cover two hundred miles of track. *Your skin's on the line. And if you don't think your skin's valuable, you wait until you have to sit down at one of these tables, man, and sue them*, and then they hand the file over to some lawyer, and say, 'Here, Mr. Young, you go down there and *beat them down just as hard as you can beat them down. . . .*' We was talking about they give it to a lawyer to come down hear to *beat it down. That's the way they operate. They're not going to put nobody to do — to keeping up these tracks or anything else as long as you people don't come down here and halfway compensate somebody. If all you do is give them halfway compensation, and you don't fully compensate them, you can bet they ain't going to never keep it up. . . .* And *I* felt sorry for Mr. Tucker, because Mr. Tucker's doing the best with what he can do, *with what the railroad's giving him. . . .* And you know what he's trying to do? Again they've given him this file and told him to come to the courthouse *and get out of this case just as cheap as he can. But they really don't care about [appellee/plaintiff]. . . .* And *I* thought it was — *I* almost puked. *I* mean *I* almost threw up on Ray Allison over there when that man stood up and said . . . [h]e's working all out there. . . . *[Appellee/plaintiff] is one of the finest people I've ever come to this courthouse for, and if he don't go out of here with a sackful of money today*, it won't be because I have not expended myself to show you what kind of injury this man's got. . . . *I remember the time whenever I used to go to work at the railroad*, I made $12.80 a day. . . . We have no healing remedies. And the fact that you give him *a million dollars or thereabout* — when you give him that kind of money, just say five years from today it's gone to nothing, at least you've done what you could today. I don't know what the next year's going to bring, because, man, our society is living in such a . . . terrible time economically. . . . But whatever you do, *do not let this company throw this man away. Don't let them throw him away. [Appel-*

*lee Levant]* is *a good man. . . .* He's a *friend of mine. I don't mind calling [appellee] a friend because he is a friend. . . .* But what I want you to do is you're going to have a verdict form out with you, and *I* hope you'll put that figure right there. . . . 'We, the jury, find in favor of the plaintiff' — or you can just say Lee Levant — 'in the amount of *$943,904.55,* of which the amount of $11,694.79 is included for medical bills.' 'This' — *and I hope it's today* — '7th day of August, 1989. . . .' Because it'll be something that you'll always be proud of. . . . [L]et your voice speak in unison, that we're going to see that he gets his money, and we're going to stand with the Lee Levants, *that we stamp out the rest, those who would cause us to try to deviate because he's a labor man.* Stand firm for what's right. . . ." (Emphasis supplied.)

Viewing the above excerpts it is apparent that in addition to arguing for legitimate damages, appellee's counsel informed the jury that the railroad was maintaining its tracks with an inadequate number of people and would continue to do so unless the jury made them pay; that the railroad did not care about appellee; that the jury should do right by appellee whom counsel considered to be a good man and his friend; and, that the jury should stamp out those (the corporate appellant) who would try to have the jury not give appellee an award of adequate damages because appellee is a "labor man." Inherent within appellee's closing argument is the message that the big railroad needed to be punished for these transgressions. This is precisely the danger condemned in *Swindle* and which provided the primary support for the court's conclusion therein. Compare the above excerpts with the excerpts of the closing argument in *Swindle,* supra at 687, n. 1.

The attempt of the majority to distinguish *Swindle* pales, in my view, when the text of appellee's closing argument is compared with that in *Swindle,* and considering the relatively short deliberation time of the jury in this approximately week-long trial and their award of approximately $56,000 more than the figure specifically requested by appellant's counsel when he suggested to the jury how to fill out the verdict form. Moreover, the punitive references contained in the closing argument in this case were exacerbated by appellee's counsel's claim, both in his opening statement and closing argument, that he had worked for a railroad and by his personal references of appellant as his friend. These statements by clear implication conveyed to the jury that counsel was in a *preferred position* to understand the operating philosophy of a railroad company and to assert counsel's personal opinion of appellee's character.

Although appellate courts should exercise great restraint before setting aside a damage award as excessive, when at least a portion thereof can only logically be explained as having resulted from a pu-

nitive award, it must be set aside. *Swindle*, supra at 687. Although "[t]he jury are the best doctors of doubt that we know" (*Central R. Co. v. Ferguson & Melson*, 63 Ga. 84, 85), they can be lulled, as here, into rendering an inaccurate diagnostic award when presented with misleading symptoms. It then becomes the duty of an appellate court to intervene with a correct judicial prescription. Accordingly, I would not affirm the million dollar judgment rendered in this case after a deliberation of approximately 17 minutes in duration.

2. In my opinion the trial court erred in declining to grant a motion for new trial on the grounds that improper and prejudicial statements about the railroad and its counsel throughout trial were calculated to lead to a verdict that, at least in part, was intended to punish the railroad.

In addition to raising the general grounds in its amended motion for new trial, appellants asserted that the trial court erred in overruling its motion for mistrial made after numerous improper and prejudicial remarks had been made by appellee's counsel, and that the court erred in allowing appellee to argue over objection about trains with "carloads of gas" and by asking the jury to put themselves in the place of the plaintiff. See generally *Doe v. Moss*, 120 Ga. App. 762, 767 (172 SE2d 321).

At the beginning of trial, prior to the presentation of any evidence, appellant's counsel requested the trial court to instruct appellee's counsel not to make comments, statements or suggestions that the railroad and its counsel are "bad and evil people." Using its inherent power to ensure the proper conduct of judicial proceedings, the court in effect granted a broad application of the motion in limine, and informed plaintiff's counsel "not to make *derogatory remarks*" about the railroad or its counsel. (Emphasis supplied.)

A major purpose of filing a motion in limine is "to prevent *the asking of prejudicial questions and the making of prejudicial statements in the presence of the jury* with respect to matters which have no proper bearing on the issues in the case or on the rights of the parties to the suit." (Emphasis supplied.) *Harley-Davidson &c. Co. v. Daniel*, 244 Ga. 284, 285, n. 1 (260 SE2d 20). The order granting a motion in limine, "like a pretrial order, 'controls the subsequent course of the action, unless modified at trial to prevent manifest injustice. . . . All the purposes of an objection have already been fulfilled by the proceedings on the motion in limine. . . . [A]nd the record has been perfected for appeal purposes. Therefore, we see no reason for another objection at trial in order to preserve the denial of the motion on appeal." Id. at 286. In Division 1, above, numerous instances of improper and prejudicial statements by appellant are recounted, and that in one instance where appellant's counsel objected, his objection was in effect overruled.

As the record does not reflect that the oral order granting the motion in limine was ever modified in the case at bar, appellant was not required to pose any additional objections regarding violations thereof, even when such violations occurred during closing argument of opposing counsel. See *Harley-Davidson*, supra at 286.

The trial court's ruling notwithstanding, the record reflects the following comments inter alia made in the presence of the jury by appellee's/plaintiff's counsel: (a) during the course of objecting to repetitious or cumulative testimony and to the asserted badgering of a witness, implied that appellant's counsel was dragging the trial out with "silly questions"; (b) asserted appellant's counsel was knowingly engaging in "sneaky stuff"; (c) read a portion of a slip opinion in the presence of a jury, purporting to concern the issue of calling an agent of either party for purposes of cross-examination, which contained a holding that "[e]mployees of the defendant railroad company were found to be subject to *all the pressures and possible prejudice in favor of the defendant employer* if that relationship (unintelligible)" (emphasis supplied); (d) during the course of posing a sustained objection to a question asked of a local chairman representing switchmen stated, "If he [appellant's counsel] wants to put me on the stand, *I was a general chairman* for ten years and can testify *expertly* about that matter, because I know both about the law and about where he's at" (emphasis supplied); (e) during the course of arguing against an objection which was thereafter overruled stated, "That's not my question at all, Judge. He [appellant's counsel] must have been asleep"; (f) during the course of posing an objection that was overruled regarding referring a witness to his medical notes stated: "*He didn't want the jury to have the notes* that he had, and he reads him only part of it, and we offered them all into the record" (emphasis supplied) (Note: Appellant's subsequent request to the judge to instruct appellee's counsel not to make speeches while objecting was overruled); (g) during the course of posing an objection that was overruled stated, "This is absolutely insane. . . . [A]nd this guy's [appellant's counsel] going to drag out secondary gain, and this kind of stuff which has no bearing on this thing" [Note: Appellant's counsel again objected to the making of speeches during objections by appellee's counsel]; (h) during the course of posing an objection stated, "now see this guy [appellant's counsel] staggers all over the place, and suggests all kinds of things, and I object to it" [Note: At this point the trial court rebuked counsel and sent the jury out so that discussion could be held on the objection outside the jury's presence]; (i) while cross-examining a railroad witness asked who a man dressed in "gray" was in the back of the room, and argued that he wanted to know who the man was because he worked with the witness (Note: After the jury left, appellant's counsel requested the court to instruct appellee's counsel

"not to have comments in front of this jury about what he thinks," and to instruct and reprimand him in front of the jury. At this point appellant's counsel asserted that if appellee's counsel's conduct continued he would have to move for a mistrial). At this point, the trial court inquired as to what appellant's counsel was complaining about, and appellant's counsel stated that as the jury was leaving appellee's counsel had said, "Bring them on. I sure do love those kind of witnesses. That's some good witnesses for us. Bring them on." Appellee's counsel admitted he had said "Bring them on," but asserted it was in the context of a conversation where "John" (his co-counsel) had said the witness had been good. Thereupon the trial judge instructed appellee's counsel not to make "those editorial comments." Appellant's counsel reiterated that the remarks were prejudicing his client to which appellee's counsel responded, "The jury was going out, man." At this point appellant's counsel made a motion for mistrial. Appellee's counsel asserted that the jury could not have heard the remarks, but appellant's co-counsel stated without contradiction in the record that: "They stopped. The jury stopped." At the judge's suggestion, appellant's counsel stated for the record that, as the jury was being excused, appellee's co-counsel made a comment to the effect: "Boy, that sure was a good witness for us." Appellee's counsel then "got up, clapped his hands, walked back, the jury was still in the room . . . [a]nd not only what he said but how he said it, and the voice — 'Just bring them on boy. We just want some more of these kinds of witnesses." Appellant's counsel could not recall the exact words thereafter used, but stated "but the point is what he's doing is belittling my client." Thereafter neither appellee's counsel or co-counsel took exception to the characterization of the incident as placed on the record by appellant's counsel.

The trial court denied the motion, and upon the jury's return cautioned them that what lawyers say is not evidence, that the case has been aggressively and hotly contested, and not to let things lawyers say in their presence affect the jury as their job is to decide the case based on the evidence presented. But compare, *Knowles v. Dayries Rice Co.*, 10 Ga. App. 567 (1) (73 SE 856). Pretermitting the question of whether the trial court abused its discretion in failing to grant the mistrial motion, at this point in the trial, is that *the continued improper comments* of appellee's counsel, as recited in Division 1, above, coupled with the comments herein discussed, *are blatant and sufficient to raise a reasonable probability that appellant has been denied its right to a fair trial.* Accordingly, I would also reverse this holding on this ground even though appellant did not renew his mistrial motion following closing argument. Where in unusual circumstances, such as in this case, it is apparent that a new trial is essential to the preservation of the right of a fair trial, this court will act to

preserve fair trial rights. See *Menningmann v. Independent Fire Ins. Co.*, 187 Ga. App. 118, 120 (369 SE2d 295); *Hartford Fire Ins. Co. v. Rowland*, 181 Ga. App. 213, 218 (351 SE2d 650); compare *Pelham &c. R. Co. v. Elliott*, 11 Ga. App. 621 (5) (75 SE 1062); see also *Foskey v. Foskey*, 257 Ga. 736 (2) (363 SE2d 547).

I respectfully dissent. I am authorized to state that Chief Judge Sognier joins in this dissent.

DECIDED JULY 16, 1991 —
RECONSIDERATION DENIED JULY 31, 1991 — ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
*Hunter, MacLean, Exley & Dunn, Arnold C. Young, Wade W. Herring II, Alston & Bird, Jack H. Senterfitt*, for appellant.
*Billy E. Moore, Paul R. Bennett, John W. Jones*, for appellee.