**FIFTH DIVISION**
**MCFADDEN, P. J.,**
**BROWN and MARKLE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**January 11, 2024**

# In the Court of Appeals of Georgia

A23A1548. WHITE et al. v. McGOUIRK et al.

BROWN, Judge.

In this medical malpractice case, Amy McGouirk and her husband sued Tamica White, M.D. and her employer, WellStar Medical Group, LLC (collectively "the defendants"), alleging that Dr. White transected or "[c]ompletely cut through" Amy's common bile duct[1] during a cholecystectomy.[2] The jury awarded the McGouirks $10,100,000 in compensatory damages. The defendants appeal the final judgment entered on the verdict, contending that the trial court (1) erred in denying their motion for mistrial and amended motion for new trial, which was based on

---

[1] The common bile duct is the tube that carries bile from the liver to the intestines.

[2] A cholecystectomy is a surgery to remove the gallbladder.

allegedly improper remarks by the McGouirks' counsel during his closing argument, and (2) abused its discretion in failing to set aside the excessive verdict. For the following reasons, we affirm.

> A jury verdict, after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law. The jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict.

(Citations and punctuation omitted.) *Haskins v. Ga. Neurosurgical Institute*, 355 Ga. App. 781 (1) (845 SE2d 770) (2020). So construed, the evidence shows that on October 11, 2018, Dr. White performed a surgery at WellStar Hospital to remove Amy's gallbladder. During the surgery, Dr. White transected or cut Amy's common bile duct. Following the transection, Amy was transferred to Emory University Hospital where she remained for five days. A different surgeon, Dr. Sarmiento, advised against an immediate repair of the bile duct injury. On December 6, 2018, Dr. Sarmiento attempted to repair the bile duct, but could not complete the repair because

Amy's liver was "extremely fatty, really friable, [and] in a tremendously difficult condition." Dr. Sarmiento advised Amy to wait six months or a year before attempting the repair again because any surgery would have caused her liver to disintegrate and fall apart. The wound from the attempted repair was left open so that it could heal from the inside out and when the wound dressing became saturated, Amy's husband would have to change the packing, which he did for approximately six months.

In the meantime, in order for the bile to go back into the intestines, Dr. Sarmiento inserted a feeding tube into Amy's stomach to "refeed [her] bile"; a biliary drain to drain bile outside of Amy's body; and a bile bag. The bile bag collects the bile which is then manually "squirted back into the [feeding] tube" by the patient; according to Amy, she had to refeed the bile at least seven times a day. If she did not perform the procedure slow enough, it would "make [her] very nauseous [a]nd [she] would feel like [she] was throwing up." Amy had to wear the bile bag until a repair could be completed. On several occasions, Amy was hospitalized for sepsis resulting from infection of the wound as well as feeding tube and bile tube issues. Dr. Sarmiento repaired the bile duct in early October 2019, and three weeks later, all the drains and

bags were removed. In July 2020, Amy underwent surgery for four ventral incisional hernias, related to the repair.

According to Amy's expert, the pain from incisional hernias can "be life-long" and patients who have had a bile duct injury have a decreased life expectancy. Amy is also at risk for stricture or a narrowing of the connection between the bile duct and intestine because of scarring, which can result in an infection inside the bile duct, requiring hospitalization. She also must be monitored yearly for the rest of her life for signs or symptoms of a biliary stricture or liver damage. Amy incurred medical expenses in excess of $900,000, and lost wages of $26,000 per year.

Amy and her husband sued Dr. White and WellStar Medical Group for medical malpractice and loss of consortium and sought damages for pain and suffering, all past and future medical expenses and economic damage, including lost wages and the loss of consortium claim. The jury found in favor of the McGouirks and awarded $10,000,000 in general compensatory damages to Amy and $100,000 to her husband for loss of consortium. The trial court subsequently entered judgment on the verdict and this appeal followed.

1. The defendants contend that the trial court erred in denying their motion for mistrial and amended motion for new trial because the McGouirks' counsel repeatedly and improperly implored the jury to "send a message" with their verdict.[3] Specifically, the defendants cite two instances of allegedly improper argument made by the McGouirks' counsel during closing.[4] Counsel first argued, without objection, as follows:

> Now, your verdict, ladies and gentlemen — your verdict should be for a lot of money because it's a lot of damage, the past, now, and in the future. I said 65 [million]. They mentioned $5 million. I don't know where they got that. I mentioned $65 million.
>
> Think about this. There are some CEOs that make more than that in a year. Mike Trout makes $37 million a year. He's a baseball player. He makes $37 million a year. He's a baseball player for the California

---

[3] The defendants have not alleged that the trial court breached its duty under OCGA § 9-10-185 ("Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds. In its discretion, the court may order a mistrial if the plaintiff's attorney is the offender.").

[4] A different judge presided over closing arguments and the conclusion of trial because the assigned judge was unavailable.

Angels. $37 million a year to hit a baseball. He's good. Don't get me wrong.

A few weeks ago, we learned that a golfer, a guy named Dustin Johnson — they call him DJ — making $125 million to go play golf, just signed a contract a few weeks ago, $125 million to go play golf.

It's nothing for some doctors — excuse me. It's nothing for some lawyers, for some accountants, to make $1 million a year or more. It's nothing, you know, for ball players, for artists, to get paid sometimes $10 — $20 million for a show.

Here, we think it's bigger than that. Amy's been through a lot more than just that. And she — you want to talk about jobs? She's earned it. And she earns it every day, and is gonna have to earn it for the rest of her life, some 40-some years according to an annuity mortality table[.]

The defendants' counsel did not object at any point during this portion of counsel's argument. Shortly after that statement, the McGouirks' counsel argued as follows:

But it's for you to decide. You are the enlightened conscience of this community. You do represent Cobb County when you decide the facts of this case based on the law in this case. You decide. *You decide what it takes to make Wellstar Medical Group and Dr. White take responsibility for ruining somebody's life.*

We all have a voice. And we should all exercise our voice. You should exercise your voice in this case. Your voice is power. You have the voice. You have the power. We ask you to use it. *We ask you to decide what it will take for the defendants to take responsibility for ruining a good part of a good person, a good family's life.*[5]

Thank you very much, your Honor. And thank you all very much for your service.

(Emphasis supplied.) After counsel thanked the jury, counsel for the defendants asked to approach the bench. Following an untranscribed bench conference, the trial court advised the jury that closing arguments had concluded and that the court would take a ten-minute recess and then advised as follows: "I know it's the lunch hour. I'm acutely aware of that. But I want to go ahead and give the [c]ourt's charge to you as soon as I can. . . . I'll send you back with the bailiff. And, in the next 15 minutes or so, I'll anticipate we'll regather in here and the [c]ourt will give you its charge." The jury then exited the courtroom, whereupon the trial court stated, "Let's gather back in

---

[5] In their brief, the defendants allege that the phrase "take responsibility" is synonymous with "punish" and is not interchangeable with the phrase "find liable," as found by the trial court.

here in five minutes. We'll take up that issue." When the court and parties reconvened, counsel for the defendants moved for a mistrial

> based on the closing argument. In fact, the very end of Plaintiffs' counsel's argument where he said you have — basically, you have the power with your verdict to tell Wellstar and Dr. White that they need to take responsibility for this malpractice. And that, coupled with the baseball players and artists and 65 million thing — dollar things they were talking about as far as salaries and whatnot, I don't know that I've heard a more clear — clear send-a-message argument made without a punitive damage claim.

The trial court denied the motion, ruling as follows:

> Well, notwithstanding the fact that my 29-year friendship with Judge Morgan might end were I to grant your motion for a mistrial, I'm going to respectfully deny that motion and allow the case to proceed to a jury. I understand the thrust of your argument. And the [c]ourt simply concludes that the jury should consider the evidence that they have heard during this week-long trial and render a verdict they believe is consistent with the evidence to be in this particular matter.

> Following trial, the defendants moved for a new trial. The trial court denied the

motion, as amended,[6] ruling that the defendants waived any challenge to the first

[6] We note that the judge who presided over the majority of the trial heard and decided the motion for new trial.

remark regarding the salaries of professional athletes because they failed to object contemporaneously and that the phrase "'take responsibility,'" as used by counsel during closing, was not improper (in fact it was "innocuous") and "did not permeate or taint the trial[.]"

(a) "Counsel is permitted wide latitude in closing argument, and defining the bounds of such argument is within the trial court's discretion." *Hamilton v. Shumpert*, 299 Ga. App. 137, 142-143 (3) (682 SE2d 159) (2009), overruled on other grounds, *Williams v. Harvey*, 311 Ga. 439, 451 ( 1) (b), n.12 (858 SE2d 479) (2021). However, where punitive damages have not been sought, it is improper for counsel to argue that the defendant must be punished and penalized so that the conduct will never occur again. See *Carlin v. Fuller*, 196 Ga. App. 54, 55 (3) (395 SE2d 247) (1990). And, "[w]hen a litigant's closing argument . . . is improper under the law, and the trial court overrules his opponent's objection on that basis and fails to take corrective action, an appellate court will reverse a judgment if it finds that the uncorrected improper argument could have affected the jury's verdict." *Steele v. Atlanta Maternal-Fetal Medicine*, 271 Ga. App. 622, 622-623 (1) (610 SE2d 546) (2005), overruled on

other grounds, *Smith v. Finch*, 285 Ga. 709, 712 (1) (681 SE2d 147) (2009). Nonetheless, as the Supreme Court noted in *Williams*,

> [t]he contemporaneous objection rule, which has been a cornerstone of Georgia trial practice for over 150 years, generally requires that, in order to preserve a point of error for the consideration of an appellate court, counsel must take exception to the alleged error at the earliest possible opportunity in the progress of the case by a proper objection made a part of the record.

(Citation and punctuation omitted.) 311 Ga. at 442 (1) (dealing with a contemporaneous objection to an alleged violation of a ruled-upon motion in limine); *Hamilton*, 299 Ga. App. at 143-144 (3) ("[t]he time to object is when the impropriety occurs at trial"). See also *Mullins v. Thompson*, 274 Ga. 366 (553 SE2d 154) (2001); *Butler v. State*, 273 Ga. 380 (541 SE2d 653) (2001) (rejecting the notion that a motion for mistrial based upon an improper closing argument can be made after closing argument, and holding that such a motion must be made at the time the improper argument is uttered).

In this case, the defendants did not object to the first instance of alleged improper argument by the McGouirks' counsel regarding the salary of lawyers and

10

professional athletes.[7] Accordingly, they have failed to preserve for review any challenge to that argument. See *Cowart v. State*, 294 Ga. 333, 336-337 (3) (751 SE2d 399) (2013) (defendant's objection and motion for mistrial, made after the prosecutor's closing argument ended, were not timely, and he therefore failed to preserve this issue for appeal). The defendants nonetheless contend that the entirety of counsel's arguments at trial must be considered to determine their overall impropriety, and that in this case, counsel's argument throughout trial injected an improper motive and an improper "send a message" argument, which permeated the trial and culminated with an argument that the jury award punitive damages to which the McGouirks were not entitled as a matter of law. We are not persuaded for two reasons.

---

[7] We note that the second alleged instance of improper argument — where the McGouirks' counsel twice advised the jury that it was up to them to decide what it would take for the defendants to take responsibility — really had two parts to it. While we acknowledge that the defendants objected after the second part just after counsel thanked the jury and completed his closing argument, the defendants did not object to the first part, which occurred eight sentences/statements before the second part. The time to make an objection and ask the trial court to take action to a statement which the defendants believed to be improper was right after the first part. Instead, the defendants' counsel failed to interpose a contemporaneous objection to the first part, thus allowing the McGouirk's counsel to repeat the allegedly improper statement a second time. Regardless, as discussed, infra, we do not find that the statements improperly asked the jury to "send a message" or to award punitive damages.

(i) First, we agree with the trial court that the word "responsibility" is not synonymous with "punitive" and do not find that the McGouirk's statements improperly asked the jury to "send a message" or to award punitive damages. We rejected a similar argument in *F.D. Wilson Trucking Co. v. Ferneyhough*, 269 Ga. App. 736 (605 SE2d 132) (2004) (physical precedent only). In that case, the defendants alleged that the trial court erred in overruling their objections and motion for mistrial arising out of the plaintiffs' statements during closing argument that "defendants had 'beat up' on the plaintiffs during the litigation, had tried to 'crush' plaintiffs 'like a bug,' had lied and cheated and stole from the plaintiffs, had brought in paid witnesses to dispute plaintiffs' claims, and had engaged in 'corporate greed.'" Id. at 736 (1). The plaintiffs then "asked the jury to treat the defendants as the defendants had treated plaintiffs." Id. We concluded that the plaintiffs did not ask the jury to send a message or to award punitive damages, finding that plaintiffs were

> [c]onstricted by their request for only compensatory damages, [and that] their admonition that defendants had engaged in wrongdoing and should be treated as they treated [the plaintiffs] fell within allowable argument. *Such merely reflects the natural consequence of awarding compensatory damages, which is that defendants are motivated to change their conduct to avoid future awards of compensatory damages.*

12

(Emphasis supplied.) Id. at 737 (1). In denying the defendants' motion for mistrial, the trial court noted that the plaintiffs had clearly advised the jury they were only seeking compensatory damages. Id. at 737-738 (1).

The McGouirks' counsel's statements in this case were similar to those in *Ferneyhough*. The McGouirks did not ask the jury to punish or penalize the defendants; rather, they advised the jury that the defendants "fight everything" and that their actions caused considerable injury to Amy and that they should be responsible for paying damages for that harm. Additionally, as in *Ferneyhough*, the McGouirks made clear to the jury several times during closing arguments that they were seeking compensatory damages, explaining that the jury could not fix Amy, but that they could "make it right [by] award[ing] money damages for compensation for damage done," and that they would be considering "various categories [or buckets] of damages," including pain and suffering, past lost wages, and past and future medical expenses. The trial court also charged the jury that it could award damages for compensation for Amy's injury, her medical expenses and lost wages, and her past and future physical and mental pain and suffering, and for loss of consortium.

(ii) Second, even if we were to assume that the statements made during closing argument were improper, we do not find that the improper arguments permeated the trial such that a new trial is required. The defendants cite to only one other instance during opening statements where the McGouirks' counsel made an allegedly improper remark.[8] During opening statements, the McGouirks' counsel made the following remark: "And you'll speak in your verdict on behalf of all of Cobb County when you make your decisions on that." Immediately after this remark was made and before counsel made any other statement, the defendants' counsel asked to approach the bench. An untranscribed bench conference took place, after which the McGouirks'

---

[8] Although the defendants allege "[r]epeated instances of 'they made us sue' and 'they won't admit liability,'" and counsel's emphasis on the defendants as "big corporations," they fail to provide record cites for those instances, and we will not cull the lengthy trial transcript looking for them. See *Ward-Poag v. Fulton County*, 351 Ga. App. 325, 327, n.3 (830 SE2d 799) (2019). In our review of the transcript, we noted one instance during opening statements when the McGouirks' counsel remarked as follows: "Well, doctors and general surgeons, in particular, and medical corporations have to follow basic standards of care. They have to follow basic safety rules. When they don't follow safety rules or standards of care and someone gets hurt badly, then the doctor and the corporation are responsible for the harm that they do[.]" Counsel also explained during closing arguments the idea of vicarious liability and that an employer or corporation is responsible for the acts of its employee. We fail to see how these remarks emphasize the defendants as "big corporations." Indeed, the trial court in its charge to the jury reiterated that "[e]very person or corporation shall be liable for tort[s] committed by its agent or employee[.]"

14

counsel continued his opening statement: "So you will be deciding this case, ladies and gentlemen, based on the evidence in this case, only the evidence in this case, and only the facts in this case. . . . When you do that, though, you're doing this, you know, as jurors for Cobb County." After the McGouirks' counsel concluded his opening statement, the trial court excused the jury and noted that the defendants' counsel had approached the bench and objected to the comment, but that he did not want to interrupt opening. The defendants' counsel then argued that the remark was an improper send-a-message argument and moved for a mistrial. The trial court ruled that the remark did not rise to the level argued by counsel and denied the motion for a mistrial, but offered to give a curative instruction, which the defendants' counsel rejected. Pretermitting the fact that the defendants interposed a contemporaneous objection to the remark and have not challenged the trial court's conclusion that the remark was an improper send-a-message argument, one other instance of an alleged improper remark does not amount to the issue permeating the trial. Compare *Sangster v. Dujinski*, 264 Ga. App. 213, 217 (590 SE2d 202) (2003) (reversing denial of motion for new trial, concluding that "[u]nder the extreme circumstances of this case," the

15

trial court should have granted a mistrial; plaintiff's counsel repeatedly referred to forbidden matters throughout opening statements, the trial, and closing arguments).

Moreover, the defendants' reliance on *Central of Ga. R. Co. v. Swindle*, 260 Ga. 685 (398 SE2d 365) (1990), and *CSX Transp. v. Levant*, 262 Ga. 313 (417 SE2d 320) (1992), is not convincing. *Swindle* involved a claim brought under the Federal Employers' Liability Act (FELA). And, although the Supreme Court of Georgia excerpted only a portion of the plaintiff's closing argument in support of its conclusion in that case, as the *Williams* Court noted in distinguishing *Swindle*, "the Court pointed to plaintiff's attempt to establish improper motive *throughout the trial*, which culminated in the 'pejorative nature of plaintiff's closing argument.'" (Emphasis supplied.) *Williams*, 311 Ga. at 444 (1), n.3. In this case, one instance during opening statements and two during closing arguments do not amount to an attempt by counsel to establish improper motive throughout the trial.

*Levant* is also distinguishable. In that case, which also involved a claim brought under FELA, the Supreme Court reversed this Court's conclusion that the plaintiff's counsel's improper arguments did not permeate the trial. See *Levant*, 262 Ga. at 314, reversing *CSX Transp. v. Levant*, 200 Ga. App. 856, 858 (2) (410 SE2d 299) (1991).

16

In *Levant*, the trial court had granted the defendant's motion in limine, excluding any negative references about the defendant railroad and directing plaintiff's counsel not to make any derogatory remarks about the railroad or the railroad's counsel. 200 Ga. App. at 858 (2). Although the dissent mentions that the railroad's counsel had moved for a mistrial after numerous improper remarks and that the trial court allowed certain remarks over objection, id. at 865 (2) (Birdsong, J., dissenting), it is entirely unclear whether the Supreme Court's ruling was predicated on the fact that the trial court's ruling on the railroad's motion in limine was sufficient to preserve the issue for appeal or the fact that the railroad had interposed contemporaneous objections. See *Levant*, 262 Ga. at 314 (1), n.1.

We conclude that the McGouirks' statements did not amount to an argument that the defendants must be punished and penalized so that the conduct will never occur again. See *Carlin*, 196 Ga. App. at 55 (3). Accordingly, the trial court did not abuse its discretion in denying their motion for mistrial and amended motion for new trial.

(b) Given our holding above, there is no merit in the defendants' reliance on *Steele*, 271 Ga. App. at 622-625 (1), and their claim that this Court must reverse if we

17

"find that 'the uncorrected improper argument *could have* affected the jury's verdict.'"(Emphasis in original.) In *Steele*, we concluded that the defendant's counsel's closing argument was improper under the law. Id. at 624 (1). Because we have concluded in this case that counsel's argument was not improper under the law, *Steele* is inapplicable.

2. The defendants contend that the trial court abused its discretion in failing to set aside the excessive verdict. They argue that the jury's award "is so excessive that it is inconsistent with the preponderance of evidence presented at trial, and indeed shocks the conscience." We disagree.

"The question of damages is ordinarily one for the jury; and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case." OCGA § 51-12-12 (a).

> It is well established that the amount of an award for pain and suffering damages is governed by no other standard than the enlightened conscience of impartial jurors. And the defendant has a heavy burden under OCGA § 51-12-12 (a) to establish that such a damage award is excessive. In particular, appellate courts should be hesitant to second-guess verdicts where the damage award is based in any significant

18

part on pain and suffering. Therefore, for this Court to overturn the jury's verdict, it must be so flagrantly excessive or inadequate, in light of the evidence, as to create a clear implication of bias, prejudice, or gross mistake by the jurors.

(Citation and punctuation omitted.) *Vineyard Industries v. Bailey*, 343 Ga. App. 517, 524 (3) (b) (806 SE2d 898) (2017).

Here, the evidence showed that Dr. White violated the standard of care by transecting Amy's bile duct. As a result of the injury, Amy was in considerable pain, remains in pain, and incurred medical bills exceeding $900,000. She suffered complications from the injury; was hospitalized numerous times to deal with those complications and repair the duct; and was required to wear a biliary bag and various other tubes for over a year as a result of the injury. She also continues to deal with issues related to the injury, including right quadrant abdominal pain which requires pain management; struggles with standing, sitting for long periods of time, bending, and twisting; and could have permanent, long-lasting effects related to it. According to Amy, she had difficulty being a mother to her then five-year-old son who was mostly cared for by his grandmother while Amy dealt with her injury, and her relationship with her son has suffered; she "missed out on so much with [her] son .

19

. . [and has] a kind of estranged relationship that . . . is finally getting mended." Amy now struggles with the way her body looks and as of the date of trial, had been unable to return to the job she loves as a registered medical assistant. According to Amy, when she applied for a job and explained why there was a gap in her work history, the company hired somebody else for the position. Amy also testified that she feels like a failure to her family because she cannot return to work and that she and her husband had plans to have a second child but she is "afraid of doing anything to cause the repair to come undone."

In light of the evidence, we cannot say that the verdict and damages award was so flagrantly excessive as to shock the conscience. See *Hart v. Shergold*, 295 Ga. App. 94, 99 (3) (670 SE2d 895) (2008); *AT Systems Southeast v. Carnes*, 272 Ga. App. 671, 672-673 (1) (613 SE2d 150) (2005). And the defendants "point[ ] to no evidence let alone compelling evidence, nor have we found any upon review of the record," that challenges this conclusion and requires reversal. *Vineyard Industries*, 343 Ga. App. at 525-526 (3) (b). See also *Rockdale Hospital v. Evans*, 306 Ga. 847, 852 (2) (b) (834 SE2d 77) (2019) ("[h]owever framed, the threshold for an appellate court to set aside

a jury verdict approved by the trial court under OCGA § 51-12-12 (a) is 'extremely high'") (citation omitted).

*Judgment affirmed. McFadden, P. J., and Markle, J., concur.*