A04A2023. STEELE et al. v. ATLANTA MATERNAL-FETAL MEDICINE, P.C. et al.
(610 SE2d 546)

ELLINGTON, Judge.

A State Court of DeKalb County jury returned a defendants' verdict in Monique and Wayne Steele's medical malpractice action against Paul Browne, M.D., and Atlanta Maternal-Fetal Medicine, P.C. (collectively, "Dr. Browne"). The Steeles alleged that on October 19, 2000, three days before their fetus was delivered stillborn, Dr. Browne negligently failed to hospitalize Ms. Steele when he found that her blood pressure had spiked. Following the denial of their motion for new trial, the Steeles appeal, contending the trial court erred in overruling their objection to defense counsel's closing argument to the effect that the Steeles bore the burden of proving the absence of an intervening cause and in denying their request for curative instructions. They also challenge the trial court's sua sponte decision to allow the jury to submit questions for witnesses and to deliberate before the conclusion of the trial, certain evidentiary rulings, and the final jury instructions. Because defense counsel's argument was improper and could have affected the jury's verdict, the trial court erred in denying the Steeles' request for corrective action. Accordingly, we reverse.

1. The Steeles contend the trial court erred in overruling their objection to defense counsel's closing argument to the effect that the Steeles bore the burden of proving the absence of an intervening cause and in denying their request for curative instructions. When a litigant's closing argument is not based on the evidence and is

improper under the law, and the trial court overrules his opponent's objection on that basis and fails to take corrective action, an appellate court will reverse a judgment if it finds that the uncorrected improper argument could have affected the jury's verdict. *Reid v. Odom*, 199 Ga. App. 146, 147-148 (1) (404 SE2d 323) (1991).

At trial, the Steeles presented evidence of the following facts. When Ms. Steele became pregnant in the spring of 2000, she had a history of hypertension. During a previous pregnancy, she had developed superimposed pre-eclampsia which required an emergency surgical delivery when she was 27 weeks pregnant. On May 3, 2000, Ms. Steele began prenatal treatment in the pregnancy at issue in this case with an obstetrical group. One month after her prenatal care began, Ms. Steele's blood pressure increased. Her obstetricians placed her on medication and referred her to Atlanta Maternal-Fetal Medicine for additional prenatal care. For over three months, her blood pressure remained within acceptable limits. On October 16, 2000, when Ms. Steele was approximately 31 weeks pregnant, her blood pressure was 120/80. Three days later, however, Dr. Browne found that Ms. Steele's blood pressure had increased to 170/105. He increased her blood pressure medication and ordered lab tests but did not admit her to the hospital. On October 22, Ms. Steele woke at 8:00 a.m. and soon felt a heavy, painful pressure in her belly. After a series of telephone conversations with her midwife, Ms. Steele was admitted to the hospital at 4:15 p.m.; the triage nurse detected no fetal heartbeat at that time. The fetus was delivered stillborn at 6:49 p.m.

Ms. Steele's obstetrician determined that Ms. Steele had suffered a placental separation or "abruption." The obstetrician and the midwife observed that the fetus had extensive skin peeling or "maceration" at delivery. Based on the fetus's appearance, the obstetrician believed that the fetus died at least 24 hours before delivery and, therefore, before Ms. Steele awoke at 8:00 a.m. on October 22. An expert witness called by Dr. Browne believed that the placental abruption killed the fetus and that "more likely than not" the fetus died at least 12 hours before delivery.

During closing argument for Dr. Browne, his attorney argued that the conduct of Ms. Steele and/or the midwife beginning at the time Ms. Steele awoke on the morning of October 22 constituted an intervening cause of the fetus's death. Counsel stated: "[The Steeles'] expert says [the fetus] died a couple of hours before [delivery]. Now why is that relevant? . . . Because one of two things happened on that Sunday morning, and only God, [Ms. Steele's midwife], and Ms.

Steele know[ ]." Counsel told the jury that the judge would charge them regarding the concept of an intervening cause, which he described as an event that breaks "the chain reaction of causation."[1] In addition, counsel told the jury that the Steeles had the burden of proving "that there was not an intervening cause[,]" and argued that the Steeles had not met that burden. The jury returned a general verdict for Dr. Browne.

Contrary to the defense's argument, the Steeles' expert did not testify affirmatively that he believed the fetus died a couple of hours before delivery. Rather, the record shows that the expert refused to give a specific estimate of the time of death.[2] Our review of the record reveals a consensus of the medical evidence that the Steeles' fetus could not have been saved by any action taken after 8:00 a.m. on October 22. Yet counsel for Dr. Browne argued that the jury should return a verdict for Dr. Browne if it found that the Steeles failed to prove that the conduct of Ms. Steele and her midwife *after* that time was not an intervening cause of the fetal death. This argument was contrary to the evidence and was improper under the law.[3] When the

---

[1] See *Ontario Sewing Machine Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d 533) (2002) ("[I]f, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote[;] still[,] if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.") (citation and punctuation omitted).

[2] In detail, the Steeles' expert testified:
[When she was delivered] the baby had changes consistent with [having] died over some period of time ago. [The death] was not a recent [event], . . . within the last couple of hours [before delivery]. . . . I was asked about whether anything [the midwife] did made a difference in the outcome . . . and I said, "No." . . . [That opinion was based on] the description of the baby, who seems to have been dead for some time. So, whether you pick six or eight hours to get those changes, or twelve hours, you are either at a point where the baby is already dead or is in the process of dying, and it is not clear to me that under those circumstances a prompt Caesarian section at 9:00 [a.m.] would have necessarily made a difference in the outcome. . . . This baby had been dead for [some time]. Nobody knows the exact time [after death] . . . to the minute when these changes [in the condition of the fetus's skin] occur. Some people believe it's twenty-four [hours], some people twelve. . . . [Regardless of the number of hours], from that time, [(the time of Ms. Steele's first telephone call to the midwife),] it is not obvious to me, on the basis of these changes, that the baby could have been saved even if it were alive at the time of the phone call. . . . My understanding is that it takes twelve hours or thereabouts. Nobody knows that exact number. I believe . . . [based on] those changes that the baby did not die within the last couple of hours [before delivery], and . . . on that basis, I believe that the baby was dead, at death or near death, at least at the time of the phone call in the morning.

[3] "The burden of proof generally lies upon the party who is asserting or affirming a fact and to the existence of whose case or defense the proof of such fact is essential. If a negation or negative affirmation is essential to a party's case or defense, the proof of such negation or negative affirmation lies on the party so affirming it." OCGA § 24-4-1. "[T]he ultimate burden

Steeles objected and requested corrective action, the trial court erred in refusing. *Reid v. Odom*, 199 Ga. App. at 147-148 (1); OCGA § 9-10-185.[4] See Ruskell, Davis and Shulman's Ga. Practice and Procedure (2004 ed.), § 19-24. "Since it cannot be established that the general verdict in [Dr. Browne's] favor was unaffected by the uncorrected erroneous argument, it follows that the judgment must be reversed and a new trial held." *Reid v. Odom*, 199 Ga. App. at 147-148 (1).

2. The Steeles contend the trial court erred in allowing jurors to deliberate before the conclusion of the trial and in allowing them to submit questions they wanted the court to ask witnesses. The trial court instructed the jury regarding these procedures on its own initiative and over the objection of both sides. Because the trial court may apply the same procedures on retrial, we will address this issue. In determining the applicable standard of review, we note that a trial court has wide discretion in regulating the business before it, and such discretion will not be controlled unless it is shown to have been manifestly abused. *Atlanta Newspapers v. Grimes*, 216 Ga. 74, 79 (114 SE2d 421) (1960); *Perimeter Realty v. GAPI, Inc.*, 243 Ga. App. 584, 595 (8) (533 SE2d 136) (2000). See OCGA § 15-1-3 (powers of courts).

In this case, after opening statements and before the first witness, the trial court instructed the jurors that, because the trial was expected to last several days and involve technical and specialized terminology, they would be allowed to ask witnesses questions. The court instructed the jurors that at the conclusion of the presentation of a witness's testimony they would retire briefly to the jury room, discuss whether they had questions for the witness, write any questions on a piece of paper, and give the paper to the bailiff. The court explained that it would evaluate their questions under the rules of evidence and might not ask them all. The court also instructed the jurors that it would allow them during their breaks to discuss the evidence received to that point.

---

of proof on the issue of causation is upon the plaintiff," that is, "the plaintiff must demonstrate that his or her injuries were caused by the defendant's negligence." (Citations and punctuation omitted.) *Moresi v. Evans*, 257 Ga. App. 670, 676-677 (3) (572 SE2d 327) (2002). The defendant, however, bears the burden of proving any alternative theories of causation that he presents. Id.

[4] Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds. In its discretion, the court may order a mistrial if the plaintiff's attorney is the offender.

These procedures contrast markedly with those traditionally followed in Georgia. At the outset of a trial, a judge in Georgia normally instructs the jurors to refrain from discussing the case among themselves until the close of the evidence, argument, and charge on the law.[5] Many judges remind juries of this prohibition at every break in the proceedings. In addition, most Georgia judges do not explicitly encourage the jury to assume an active, inquisitorial role, as in this case. Because these traditional jury procedures give life to important concepts underlying our adversary system of justice, some background will be helpful.[6] As summarized by one commentator:

> The central precept of the adversary process is that out of the sharp clash of proofs presented by adversaries in a highly structured forensic setting is most likely to come the information upon which a neutral and passive decision maker can base the resolution of a litigated dispute acceptable to both the parties and society.

Stephan Landsman, The Adversary System: A Description and Defense, p. 2 (American Enterprise Institute for Public Policy Research, 1984). Tracing the roots of the adversary system back to early English common law, we see that juries were originally required to be neither neutral nor passive but, rather, were required to actively investigate disputes and report their conclusions to a judge or court officer acting on behalf of the sovereign. Over several centuries, English (and later American) trial procedure evolved so that opposing litigants, represented by professional advocates both before and during trial, presented evidence to a jury in open court. Eventually, the jury came to be viewed as a completely "neutral and passive decision maker,"

---

[5] The preliminary instructions adopted as part of Georgia's Suggested Pattern Jury Instructions provide, in pertinent part:
> Please remember during the course of this trial to listen carefully to all the evidence. Do not jump to conclusions before all the evidence is presented. Also, please remember that during the course of this trial, it would be improper for you to discuss this case with anyone or to allow anyone to discuss the case with you or in your presence or hearing. You cannot discuss the case with each other in the jury room or elsewhere before actual deliberations begin, and then only in the presence of all twelve of you.

Suggested Pattern Jury Instructions, Vol. I: Civil Cases (4th ed.), Section 00.080.

[6] For the following historical and theoretical discussion, please see Harold J. Berman, The Transformation of English Legal Science: From Hale to Blackstone, 45 Emory L.J. 437, 468 (Spring 1996); B. Michael Dann, "Learning Lessons" and "Speaking Rights": Creating Educated and Democratic Juries, 68 Ind. L.J. 1229, 1231-1232 (Fall 1993); Stephan Landsman, The Adversary System: A Description and Defense, pp. 1-25, 44-51 (American Enterprise Institute for Public Policy Research, 1984).

expected to refrain from making any judgments until the conclusion of the contest and . . . prohibited from becoming actively involved in the gathering of evidence or the settlement of the case. Adversary theory suggests that if the decision maker strays from the passive role, he runs a serious risk of prematurely committing himself to one or another version of the facts and of failing to appreciate the value of all of the evidence.

Id. at 2-3. Rules of procedure and evidence were honed to enforce this neutrality. In Georgia, the instructions given to the jury at the beginning of a trial reflect the jury's traditionally passive role before final deliberations of attending to the evidence and arguments presented by counsel and the law presented by the judge. Suggested Pattern Jury Instructions, Vol. I: Civil Cases (4th ed.), Sections 00.010-00.090, 02.570.

In a criminal case from the Court of Appeals for the Third Circuit, we find an excellent discussion of the reasons for the "generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body":

[O]nce a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion. Consequently, the mere act of openly expressing his or her views may tend to cause the juror to approach the case with less than a fully open mind and to adhere to the publicly expressed viewpoint. . . . [T]he jury system is meant to involve decisionmaking as a collective, deliberative process and premature discussions among individual jurors may thwart that goal.

(Citations omitted.) *United States v. Resko*, 3 F3d 684, 688-689 (II) (B) (3rd Cir. 1993). Because the court provides the jury with legal instructions only after all the evidence has been presented, jurors who engage in premature deliberations do so without the benefit of the court's instructions on the applicable legal standards. Id. Also, because any premature discussions are likely to occur before the defendant has presented all of his evidence, it is likely that any initial opinions formed by some jurors, which may influence other jurors, will be unfavorable to the defendant for this reason. Id. When jurors form premature conclusions about a criminal case, the burden of proof will have been, in effect, shifted to the defendant, who faces the

task of overcoming a bias in favor of the State, even though as a matter of law the State bears the burden of proof. Id. Further, jurors may draw unwarranted inferences from the trial court's refusal to pose certain questions to a witness.

These same concerns pertain to civil litigants who, while not protected by the Sixth Amendment,[7] are entitled to due process, "a fair trial in a fair forum," under the Fifth, Seventh, and Fourteenth Amendments.[8] Landsman, The Adversary System: A Description and Defense, p. 48. Although Georgia is not one of the states that have codified the prohibition of pre-deliberation discussions,[9] the Supreme Court of Georgia has found it "clearly erroneous" for jurors to violate the trial court's instructions not to discuss the case before final deliberations. *Sims v. State*, 266 Ga. 417, 419-420 (3) (467 SE2d 574) (1996) (error was harmless under the circumstances presented). See also *Huff v. State*, 239 Ga. App. 83, 87-88 (3) (519 SE2d 263) (1999) (accord).

Turning to the issue of encouraging the jury to propose questions for witnesses, we note that the principle that the parties are responsible for producing the evidence upon which the decision will be based is "[i]ntimately connected with the requirements of decision maker passivity and neutrality." Landsman, The Adversary System: A Description and Defense, p. 4. In Georgia, "a trial court may receive written questions from the jury and ask those questions the court finds proper," but, as when propounding its own questions to witnesses, must exercise great caution to avoid the appearance of commenting on the evidence.[10] (Citation omitted.) *Lance v. State*, 275

---

[7] See *Pulliam v. Balkcom*, 245 Ga. 99 (1) (263 SE2d 123) (1980) (Sixth Amendment protections do not apply in civil actions); *Crane v. Samples*, 267 Ga. App. 895, 896 (1) (600 SE2d 624) (2004) (accord).

[8] See also *Herringdine v. Nalley Equip. Leasing*, 238 Ga. App. 210-211 (1) (517 SE2d 571) (1999) (physical precedent only) (recognizing the purpose of the Civil Practice Act to promote and not to obstruct the administration of justice and thus enable the court to do substantial justice).

[9] For a discussion of the longstanding common law rule and its codification in several states, see *State v. Washington*, 438 A2d 1144, 1148 (Conn. 1980) (finding error of constitutional magnitude in trial judge expressly instructing jurors that they may discuss the case among themselves prior to its submission to them).

[10] Because judges are also required to be neutral, it is reversible error under Georgia law for a trial judge "to express or intimate his opinion as to what has or has not been proved" either during the trial or in his charge to the jury. OCGA §§ 9-10-7 (civil trials); 17-8-57 (criminal trials). As both the Supreme Court of Georgia and this Court have recognized, "[i]t is always wiser, safer, better, and juster that trial judges should confine themselves exclusively to an enunciation of the law, leaving to counsel the duty of elucidating the facts, and to juries the finding of the truth in the evidence." (Punctuation and footnote omitted.) *Coggin v. Fitts*, 268 Ga. 112, 113 (2) (485 SE2d 495) (1997), quoting *Ford v. State*, 2 Ga. App. 834, 838 (59 SE 88) (1907). While Georgia law permits a trial judge "to propound questions to any witness for the purpose of developing the truth," a trial judge as a neutral administrator of justice must scrupulously avoid the appearance of taking the side of one litigant over another and thus

Ga. 11, 22 (22) (560 SE2d 663) (2002). Further, we have stated that a trial court should not solicit such questions from the jury. *Story v. State*, 157 Ga. App. 490 (278 SE2d 97) (1981).[11]

In this case, the procedures implemented by the trial court modified the traditional roles of the jury, the trial judge, and the lawyers. These procedures encouraged the jury to take an active, inquisitorial role, made the trial judge to some extent the jury's mouthpiece in pursuing its own version of the facts, and correspondingly reduced counsels' control over the presentation of the evidence. Clearly these changes have an effect on the traditional adversary system.[12] Although the trial court cited many sources in support of its opinion that the nationwide trend is to allow juries to discuss the evidence before final deliberations and to submit questions for witnesses,[13] we are not persuaded that Georgia has embraced that trend. Dr. Browne (who, after a favorable verdict, now supports the trial court's jury procedures) has not identified any legislation, court rule, pattern instruction, court commission report, or pilot project demonstrating a prevailing view that Georgia's jury system should be reformed in this way. Although these reforms may well be worthwhile[14] — and may ultimately be formally adopted in Georgia — we

---

influencing the jury's verdict. *Coggin v. Fitts*, 268 Ga. at 113 (2).

> Th[e] rule against commenting on the evidence hovers over any judge's examination of witnesses. First, it is difficult for the court to conduct extensive questioning of a witness without becoming an advocate. Second, the trial court's questioning usurps the duty of counsel to bring out the facts and thus confuses and disparages the attorneys who are trying the case. Third, a long examination may divert the jurors' attention from the witnesses' testimony to the court's questions in an effort to ascertain the judge's opinion.

(Punctuation and footnotes omitted.) Id.

[11] We note that in *Lance v. State* the Supreme Court's opinion is silent regarding whether the judge or the jury initiated the jury questioning process. 275 Ga. at 22 (22).

[12] We acknowledge that the trial court attempted to minimize any negative impact of these procedures by carefully instructing the jury to remain neutral and open-minded throughout the trial, to avoid prematurely fixing opinions, to give answers to the jury's questions no greater weight than questions posed by counsel, to draw no inferences from the court's failure to pose any particular question the jury submitted, etc.

[13] For a compilation of cases considering similar procedures, see Propriety and Effect of Jurors' Discussion of Evidence Among Themselves Before Final Submission of Criminal Case, 21 ALR4th 444 (2004); and Propriety of Jurors Asking Questions in Open Court During Course of Trial, 31 ALR3d 872 (2004).

[14] See, e.g., Dann, "Learning Lessons" and "Speaking Rights": Creating Educated and Democratic Juries, 68 Ind. L.J. 1229 (describing theoretical basis for many jury reforms); Janessa E. Shtabsky, A More Active Jury: Has Arizona Set the Standard for Reform with its New Jury Rules?, 28 Ariz. St. L.J. 1009 (Fall 1996) (describing jury reforms implemented in Arizona); Natasha K. Lakamp, Deliberating Juror Predeliberation Discussions: Should California Follow the Arizona Model?, 45 UCLA L. Rev. 845, 870-877 (Feb. 1998) (reporting on an empirical study of Arizona reforms and recommending adoption in California); Rebecca L. Kourlis et al., Colorado Jury Reform, 29 Colo. Law. 21, 22 (Feb. 2000) (reporting results of a pilot project). In addition, on December 9, 2004, the American Bar Association's "American Jury Project" issued a draft entitled "Principles for Juries and Jury Trials" which suggests that jurors be permitted

think it more prudent at present to refrain from imposing them on unwilling litigants.

3. The Steeles contend the trial court erred in excluding photographs of their stillborn fetus. Because this issue may recur on retrial, we will address it. "The admission or exclusion of photographic exhibits is a matter within the discretion of the trial court, and unless abuse of discretion appears, no error is shown. [Further,] [t]he burden is on the party seeking reversal to show not only error, but also injury arising from the alleged error." (Citations and punctuation omitted.) *Halta v. Bailey*, 219 Ga. App. 178, 180-181 (3) (464 SE2d 614) (1995). The Steeles sought to offer one photograph of the dead fetus as evidence that skin peeling was present when the fetus was delivered and three additional photographs as "your basic evidence that you have in a wrongful death case." The trial court excluded the photographs after finding that the photographs were "emotionally provocative" and inflammatory and that there was no dispute that the fetus showed skin peeling at delivery.

"Evidence which is relevant to an issue is admissible and is not subject to an objection it might inflame the minds of the jury, or prejudice the jury, and this is true even where the offered evidence is only cumulative." (Citations and punctuation omitted.) *Associated Health Systems v. Jones*, 185 Ga. App. 798, 803 (3) (366 SE2d 147) (1988). See also *Ramey v. State*, 250 Ga. 455, 456 (1) (298 SE2d 503) (1983) ("Photographs which are relevant to any issue in the case are admissible even though they may have an effect upon the jury.") (citations omitted). On the other hand,

> [r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence[;] such considerations are appropriately committed to the trial court's sound exercise of discretion.

(Citations and punctuation omitted.) *Bell v. State*, 203 Ga. App. 109, 110-111 (3) (416 SE2d 344) (1992). In this case, although one photograph was arguably relevant to the issue of the time of fetal death, the fact that the fetus displayed skin peeling at delivery was not disputed and was supported by other evidence. Under such circumstances, the

---

to submit written questions for witnesses, Principle 13.C, and discuss the evidence during recesses during trial when all are present, Principle 13.E. The draft is scheduled to be considered at the February 2005 meeting of the ABA's Board of Governors.

trial court was authorized to find that the photographs' slight probative value was substantially outweighed by the danger of unfair prejudice.

4. The Steeles contend the trial court erred in giving a charge on hindsight, arguing the charge is inherently misleading and confusing. In addition, the Steeles contend the charge was not supported by the evidence. Because the issue may recur on retrial, we will address it.

The Steeles argued that Ms. Steele was developing superimposed pre-eclampsia when Dr. Browne examined her on October 19 and that Dr. Browne's failure to hospitalize her at that time was negligent. The Steeles conceded that the placental abruption could not have been predicted or prevented but argued that if Dr. Browne had hospitalized Ms. Steele because of pre-eclampsia then the placental abruption would have occurred in the hospital and the fetus could have been saved by an emergency surgical delivery. In this regard, Dr. Browne argued that only in hindsight would he know that if he failed to hospitalize Ms. Steele for possible pre-eclampsia then a placental abruption might occur too far from an operating room for the fetus to be saved.

The trial court gave the pattern jury instruction on hindsight:

> In a medical malpractice action, a defendant cannot be found negligent on the basis of an assessment of a patient's condition which only later, in hindsight, proves to be incorrect so long as the initial assessment was made in accordance with reasonable standards of medical care. In other words, the concept of negligence does not include hindsight. Negligence consists of not foreseeing and guarding against that which is probable and likely to happen, not against that which is only remotely and slightly possible.

Suggested Pattern Jury Instructions, Vol. I: Civil Cases (3rd ed.), Part XXXII (CC) (2). See also Suggested Pattern Jury Instructions, Vol. I: Civil Cases (4th ed.), Section 62.311.

The Steeles contend the last sentence of the charge is inherently misleading, confusing, and in conflict with "standard of care" instructions. Our previous approval of the pattern charge defeats this argument. *Haynes v. Hoffman*, 164 Ga. App. 236, 238 (3) (296 SE2d 216) (1982).

In addition, the Steeles contend the charge was not supported by the evidence. When reviewing whether a charge was warranted by the evidence at trial, we must determine if there was any evidence presented at trial to support giving the charge. *Rolleston v. Cherry*, 226 Ga. App. 750, 754 (2) (a) (487 SE2d 354) (1997). In a medical

malpractice case, a hindsight charge is authorized "where the evidence raises an issue as to whether the negligence claim is based on later acquired knowledge or information not known or reasonably available to the defendant physician at the time the medical care was rendered." (Punctuation and footnote omitted.) *Mercker v. Abend*, 260 Ga. App. 836, 839 (1) (581 SE2d 351) (2003). In this case, the evidence raised an issue of whether the Steeles' claims were based on knowledge or information reasonably available to Dr. Browne only after he assessed Ms. Steele on October 19. Accordingly, the charge on hindsight was authorized. Id.

*Judgment reversed. Andrews, P. J., and Miller, J., concur.*

DECIDED JANUARY 24, 2005 —
RECONSIDERATION DENIED FEBRUARY 14, 2005 —

*Peterson & Harris, Allen F. Harris, Jim N. Peterson, Jr.*, for appellants.

*Hall, Booth, Smith & Slover, John E. Hall, Jr., Jonathan Marigliano*, for appellees.