**THIRD DIVISION**
**BARNES, P. J.,**
**BOGGS and BRANCH, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**June 24, 2014**

# In the Court of Appeals of Georgia

A14A0648. ARMSTRONG et al. v. GYNECOLOGY & OBSTETRICS OF DEKALB, P.C., et al.

BOGGS, Judge.

Carlethia and Opprezender Armstrong ("the Armstrongs") brought this medical malpractice action against Gynecology & Obstetrics of DeKalb, P.C. and three physicians ("the physicians") after their daughter was stillborn. A jury returned a verdict in favor of all defendants, and the Armstrongs brought a motion for new trial based upon juror misconduct. The trial court denied the motion for new trial, and the Armstrongs appeal, asserting three enumerations of error: failure to grant a new trial on the basis of juror misconduct; a jury instruction on hindsight; and the limitation of the testimony of a witness. For the following reasons, we affirm.

1. The Armstrongs' motion for new trial was based upon juror misconduct in using cellphones during deliberation to obtain definitions of words or terms in the written instructions sent out with the jury. The trial court made a very thorough and complete inquiry, summoning all the jurors for examination in court. Each juror was sequestered and examined individually regarding the Armstrongs' allegations; both counsel were given the opportunity to ask questions as well.

The jurors' testimony differed in some respects. Six jurors did not recall which words were researched,[1] and one juror did not recall any words being looked up. Ultimately, testimony was presented that one or more jurors sought definitions of four words or terms: "causation," "proximate cause," "requisite," and "decedent."[2] The Armstrongs elicited no testimony regarding the results of the jurors' search for definitions of the terms in question, whether those results differed from the

---

[1]One juror testified that she looked up a word that she did not recall, but that she believed was misspelled in the written instructions. During deliberations, the jury sent a question to the judge regarding the phrase "casual relation" in the jury instruction on proximate cause, and the trial court corrected the typographical error of "casual" for "causal."

[2]While the affidavit filed with the Armstrongs' motion for new trial stated that the jurors looked up "standard of care," when questioned by the trial court this juror testified that he did not remember that term being researched. Other jurors who were questioned on the issue denied that "standard of care" was one of the definitions sought.

2

instructions given to the jury, or whether the jurors relied upon those definitions in reaching a verdict.

After examining the jurors and receiving extensive briefing from all counsel on the issue, the trial court entered a commendably thorough and detailed order discussing the jurors' testimony in light of the applicable legal authority. The court found that, although several jurors improperly used their phones to search for definitions of words, their conduct had no effect on the verdict; it therefore denied the motion for new trial.

Under former OCGA § 9-10-9, the affidavits of jurors could be received only to sustain, not impeach, their verdict. An exception existed in criminal cases in which "compelling personal interests of life and liberty" were implicated. *Riddle v. Beker*, 232 Ga. App. 393 (501 SE2d 893) (1998). But since the trial of this case occurred after January 1, 2013, the relevant statutory provision regarding post-verdict juror testimony is now found in OCGA § 24-6-606 (b):

> Upon an inquiry into the validity of a verdict or indictment, a juror shall not testify by affidavit or otherwise nor shall a juror's statements be received in evidence as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon the jury deliberations or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or

3

concerning the juror's mental processes in connection therewith; *provided, however, that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the juror's attention*, whether any outside influence was improperly brought to bear upon any juror, or whether there was a mistake in entering the verdict onto the verdict form.

(Emphasis supplied.) As the trial court correctly observed, Georgia's new Evidence Code "adopted, in large measure, the Federal Rules of Evidence, and its sections are comparable to corresponding federal rules. Because of this similarity, it is proper that we give consideration and great weight to constructions placed on the Federal Rules by the federal courts." (Citations, punctuation, and footnotes omitted.) *Jones v. State*, __ Ga. App. __ (1) (Case No. A13A1940, decided March 28, 2014.)

The parties and the trial court rely upon a Tenth Circuit decision, *Mayhue v. St. Francis Hosp.*, 969 F2d 919, 924 (II) (10th Cir. 1992), which identifies a number of factors to consider in determining whether a party was prejudiced by extraneous information in the form of dictionary definitions. To rebut a presumption of prejudice, the opposite party must show: (1) the importance of the term in question to the legal

or factual issues in the case;[3] (2) the extent to which the extraneous definition differs from the jury instructions or the law; (3) the extent of the jury's discussions and emphasis on the extraneous definition; (4) the strength of the evidence and whether the jury had difficulty in reaching a verdict;[4] and (5) any other relevant factors. Id. In a criminal context, the Eleventh Circuit employs a similar analysis, but it holds that prejudice is not presumed:

> When jurors consider extrinsic evidence, we require a new trial if the evidence poses a *reasonable possibility of prejudice* to the defendant. Prejudice is not presumed. The defendant has the burden of demonstrating prejudice by a preponderance of credible evidence. Such prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations. . . . Subject only to Federal Rule of Evidence

---

[3]The physicians point to the foreman's testimony that the jury based its verdict on a determination that the physicians did not violate the applicable standard of care in their treatment of Mrs. Armstrong. From this, they argue that any search for definitions of "cause" or "proximate cause" was irrelevant to the jury's verdict. The trial court noted that most federal circuits agree that a juror may not testify to the effect of an extraneous influence upon deliberations. But we need not address this question because, as noted below, the substance of the definitions at issue here was never shown.

[4]While the jury announced early in deliberations that it was deadlocked, the trial court explicitly considered this issue and concluded that "[t]his sort of announcement is not unusual in a medical malpractice case," and that the jury "continued to discuss the case at length after the words were searched before they reached a decision."

5

606(b), the court may use whatever inquisitorial tools are necessary and appropriate to determine prejudice. If after this inquiry the court determines that the defendant met his burden of showing by a preponderance of the evidence the likelihood of jury prejudice, the burden shifts to the government to prove that the consideration of the extrinsic evidence was harmless. In recognizing the degree of prejudice required and the government's burden to establish harmless error, the strength of the government's case has a bearing on the issue of prejudicial error. Also relevant is the nature of the information learned by the jurors and the manner in which it was revealed. Finally, the standard by which we review the district court's determination of whether the defendants were prejudiced is a factual one committed to the court's large discretion.

(Citations, punctuation, and footnotes omitted; emphasis in original.) *United States v. Rowe*, 906 F2d 654, 656-657 (III) (11th Cir. Ga. 1990).[5]

---

[5]Although *Rowe* is a criminal case, the Eleventh Circuit has applied it in a civil context. See *BankAtlantic v. Blythe Eastman Paine Webber Inc.*, 955 F2d 1467, 1472 (B) (2) (a) (11th Cir. 1992). Likewise, *Mayhue*, supra, relies upon criminal decisions in evaluating improper jury conduct. 969 F2d at 922-923 (III). The statement of the Eleventh Circuit in *Rowe*, supra, that "[p]rejudice is not presumed," 906 F2d at 656, is consistent with long-standing Georgia law on this issue in civil cases. The Eleventh Circuit has also applied this rule in a civil context. *BankAtlantic*, supra, 955 F2d at 1471-1472 (2) (a). We note that while the Tenth Circuit states in *Mayhue* that it will apply a presumption of prejudice, *Mayhue*, supra, 969 F2d at 922, the District of Columbia Circuit observed that the *Mayhue* court does not apply a presumption, but instead employs the five-factor test. *United States v. Williams-Davis*, 90 F3d 490, 502 (I) (B) (2) (D.C. Cir. 1996). Moreover, "the federal circuits disagree on . . . any

But the new Evidence Code does not change Georgia's long-standing rule that "[a] motion for new trial because of improper juror conduct is addressed to the sound discretion of the trial judge, and unless there is an abuse of discretion, the appellate court will not upset the trial court's determination." (Citations and punctuation omitted.) *Dryman v. Watts*, 268 Ga. App. 710, 711-712 (2) (603 SE2d 51) (2004); see also *Kellett v. Kumar*, 281 Ga. App. 120, 126 (4) (635 SE2d 310) (2006), citing *Riddle*, supra, 232 Ga. App. at 394. In fact, the federal courts agree that the trial court should be reversed only for abuse of discretion, given the trial judge's unique ability to observe the jurors and assess any potential prejudice. See *Mayhue*, supra, 969 F2d at 922 (II) (affirming trial court's decision granting new trial "because there is credible evidence in the record to support it"); *Rowe*, supra. Nor does the new Evidence Code alter the general rule that "[a]n appellant must show harm as well as error to prevail on appeal; error to be reversible must be harmful." (Citations and punctuation omitted.) *American Home Svcs. v. A Fast Sign Co.*, 322 Ga. App. 791, 794 (1) (b) (747 SE2d 205) (2013); see *Wood v. Food Giant*, 183 Ga. App. 604, 605 (3) (359 SE2d 410) (1987) (when appellant alleged juror misconduct but failed to

presumption of prejudice" in the absence of jury tampering by a third party. *Tunstall v. Hopkins*, 306 F3d 601, 610 (II) (C) (8th Cir. 2002) (declining to presume prejudice in extraneous information case).

7

show "any harm or prejudice resulting from the juror's alleged actions," trial court did not abuse discretion in denying motion for new trial.)

Here, evidence of prejudice was lacking. As the Armstrongs acknowledge, no testimony was elicited regarding the *substance* of the definitions found by jurors, and no showing has been made that the information obtained was prejudicial, or even that it differed from the trial court's written instructions which went out with the jury. Compare *Mayhue*, supra, 969 F2d at 921 (I) (extraneous and erroneous definitions used by jury discovered in a handwritten note left behind in jury room); *Steele v. State,* 216 Ga. App. 276 (454 SE2d 590) (1995) (juror copied encyclopedia definitions of manslaughter and "usual penalty," which differed from Georgia law), overruled on other grounds, *Kennebrew v. State*, 267 Ga. 400, 404 n.2 (480 SE2d 1) (1996)[6]; *Moore v. State*, 172 Ga. App. 844 (324 SE2d 760) (1984) (juror took definitions of murder and voluntary manslaughter from Reader's Digest book on law). Here, there is no showing of any variance from the jury instructions or the law, and

[6]While *Steele* refers to a presumption of prejudice, it was decided under former OCGA § 9-10-9, which allowed juror impeachment of a verdict only in criminal cases when "compelling personal interests of life and liberty" were implicated. *Riddle*, supra, 232 Ga. App. at 393.

no evidence from which to determine any discussion or emphasis on the unknown definitions under the second or third part of the *Mayhue* test.

In summary, the trial court thoughtfully considered the juror misconduct and its possible effect on the verdict. After an extensive review of the facts and the applicable law, it concluded that the extrajudicial information did not prejudice the jury's deliberations. We find no abuse of the trial court's broad discretion in that ruling.

2. The Armstrongs also assert error in the trial court's "hindsight" instruction to the jury, taken from the Suggested Pattern Jury Instructions, Vol. I: Civil Cases (5th ed.), § 62.311. In *Smith v. Finch*, 285 Ga. 709 (681 SE2d 147) (2009), our Supreme Court disapproved the pattern charge in part, but explicitly approved the first sentence of the pattern charge "in any medical malpractice case in which the facts warrant it, i.e., where the negligence claim is based in whole or in part on the assertion that the physician made an incorrect assessment of a patient's condition." Id. at 711 n.3. The trial court here gave only the first sentence of the pattern charge after extensive discussion with counsel and reliance upon *Smith*.

The Armstrongs argue that all the relevant risk factors were known to the physicians before the fact, and that a hindsight charge therefore was inappropriate.

"But jury charges are not limited to a plaintiff's characterization of the lawsuit. A trial court has a duty to charge the jury on the law applicable to issues which are supported by the evidence. If there is even slight evidence on a specific issue, it is not error for the court to charge the jury on the law related to that issue." (Citations, punctuation, and footnote omitted.) *Mercker v. Abend*, 260 Ga. App. 836, 839 (1) (581 SE2d 351) (2003). Here, a key and hotly disputed issue in the trial was whether the physicians were correct in their assessment of the length of time this high-risk pregnancy could be allowed to proceed before performing a caesarean section. The day before the scheduled delivery, Mrs. Armstrong suffered an acute placental abruption. As the Armstrongs' expert acknowledged, however, an abruption is an unpredictable event. Therefore more than slight evidence was presented raising an issue of whether the Armstrongs' claim was based on later-acquired knowledge of the placental abruption, and the hindsight charge was authorized. Id. at 840 (1). See *Steele v. Atlanta Maternal-Fetal Medicine*, 271 Ga. App. 622, 631-632 (4) (610 SE2d 546) (2005), overruled on other grounds, *Smith*, supra, 285 Ga. at 712 (1). In *Steele*, we held that the hindsight charge was supported by some evidence when the defendant physician contended that only hindsight could show that failure to hospitalize the patient would

10

result in a placental abruption occurring too far from an operating room for the child to be saved. The trial court did not err in giving the charge.

3. Finally, the Armstrongs assert error in the trial court's limitation of the rebuttal testimony of an expert witness, Dr. Shehata. This witness, a pediatric and fetal placenta pathologist, was called as a rebuttal witness immediately after the defendants rested. Asked for his opinion based on his examination of Mrs. Armstrong's pathology slides, he responded, "the slides show abruption of the placenta and the evidence of fetal stress." The physicians' counsel immediately objected that this was not proper rebuttal testimony, because no pathology testimony had been presented in their case in chief, and because there was no dispute that a placental abruption had occurred. The trial court excused the jury and heard argument from counsel. Counsel for the physicians reiterated that no pathologist testimony regarding stillbirth or slides had been presented. Counsel for the Armstrongs contended that one of the physicians had testified "that we did not know one way or the other if this was a placental abruption." The trial court responded, "No, that is not to the testimony."[7] The discussion continued:

_____

[7]On appeal, the Armstrongs give no citation to this alleged testimony; they now contend that the physician's testimony that placental abruption was the "presumed cause of death" justified rebuttal.

11

The Court: Is he going to offer an opinion about late delivery as cause of death?

Plaintiffs' counsel: He's going to offer an opinion that this abruption would have been avoided if the delivery had been done 48 hours before, based upon his review of the slides, the abruption happened during that time –

The Court: I'm not sure anybody disputes that either.

Defendants' counsel: There's no dispute.

The Court: It's a standard of care question whether they should or should not have delivered.

Plaintiffs' counsel: He's not going to answer that question.

The Court: Then he doesn't need to be here.

The trial court excused the witness, and explained to the jury:

[t]he defense has made an objection to the testimony of the last witness as not being relevant to the subject matter for this trial or for the defense put up. When you put up a rebuttal witness the witness is supposed to rebut, that is to contradict something in the testimony put up by the defense, in this case medical expert testimony. Based on the objection, I've conducted a hearing, I find that it is not relevant to rebut the defense expert testimony, therefore I have excluded that witness.

"[A]dmissibility of rebuttal evidence lies within the sound discretion of the trial court." (Citation and punctuation omitted.) *Dept. of Transp. v. Patten Seed Co.*, 290 Ga. App. 532, 537 (4) (660 SE2d 30) (2008). Here, the fact that a placental abruption occurred and caused the death of Mrs. Armstrong's child was not in dispute. The physicians acknowledged this repeatedly in their opening statement and closing

12

argument, and witnesses also testified to these facts. The trial court did not abuse its discretion in concluding that the proffered testimony did not rebut any evidence presented by the physicians. Moreover, the Armstrongs' expert had testified on direct examination that placental abruption was the cause of death in this case. The proffered testimony therefore was merely cumulative of evidence that had already been presented, and excluding it was not an abuse of discretion. *Greg A. Becker Enterprises v. Summit Investment Mgmt. Acquisitions I*, 314 Ga. App. 721, 725 (3) (725 SE2d 841) (2012).

*Judgment affirmed. Barnes, P. J., and Branch, J., concur.*