**THIRD DIVISION**
**MCFADDEN, C. J.,**
**DOYLE, P. J., and HODGES, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 24, 2020**

# In the Court of Appeals of Georgia

A20A0113. HASKINS et al. v. GEORGIA NEUROSURGICAL INSTITUTE, P. C. et al.

MCFADDEN, Chief Judge.

This appeal from a trial court's final judgment entered upon a jury verdict challenges various evidentiary rulings by the court. Because the challenged rulings were not erroneous or amounted to harmless error, we affirm.

1. *Facts and procedural posture.*

"A jury verdict, after approval by the trial court, and the judgment thereon will not be disturbed on appeal if supported by any evidence, in the absence of any material error of law." *Eagle Jets, LLC v. Atlanta Jet, Inc.*, 321 Ga. App. 386, 392 (2) (740 SE2d 439) (2013) (citation and punctuation omitted). "[T]he jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court

must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict." *Turner Broadcasting System v. McDavid*, 303 Ga. App. 593, 594 (693 SE2d 873) (2010) (citation and punctuation omitted).

So construed, the evidence shows that on April 15, 2013, Michael Haskins went to see Dr. Richard Rowe about lower back pain. Haskins reported to the doctor that he had hurt his back in 2000; that his back pain had progressively gotten worse; that he had not had surgery on his lumbar spine; but that he had undergone other surgeries, including cervical spine fusion surgery and pelvic surgery for a traumatic injury. A magnetic resonance imaging ("MRI") scan of Haskins' back showed that he had a protruding disc in his lumbar spine, and a subsequent computed tomography ("CT") scan also showed the disc protrusion. Dr. Rowe discussed various treatment options with Haskins, who opted to undergo a discectomy, a surgery to remove the protruding disc material pressing on nerves.

Dr. Rowe performed the lumbar discectomy on June 13, 2013. In the operating room after the surgery, Haskins awoke and was able to move his feet, so he was taken to a recovery room. Dr. Rowe went to the waiting area and told Haskins' wife that the

2

surgery had gone well, that Haskins was moving, and that everything looked fine. But approximately 30 minutes later, the doctor was notified by nurses that Haskins could not move his feet. Dr. Rowe went to the recovery room, examined Haskins, and diagnosed him with cauda equina syndrome ("CES") based on symptoms indicating possible spinal nerve injury. Dr. Rowe ordered another MRI scan of Haskins' lumbar spine to see if there was a hematoma or a herniated disc pressing on nerves and causing the CES. The MRI performed shortly after the surgery did not show either a hematoma or herniated disc, but it did show that there was still some stenosis, or narrowing, of the spinal canal. Dr. Rowe then performed a laminectomy, removing bone in order to make more room for the spinal nerves. After the second surgery, Haskins still could not move his feet and had other neurological deficits. He was transferred to a spinal rehabilitation center, where he spent ten days, and has continued to suffer neurological problems since the surgeries, including difficulty walking, bowel and bladder control, and erectile dysfunction.

Haskins and his wife, Haley Haskins, filed a medical malpractice complaint against Dr. Rowe and his employer, Georgia Neurosurgical Institute, P. C., alleging that the doctor had negligently caused nerve damage during the discectomy. At trial, the parties presented, among other evidence, opposing expert witnesses. The

Haskinses' expert testified that Dr. Rowe had breached the applicable standard of care in two ways – by over-retracting nerves during the discectomy and by performing the discectomy in the first place, rather than performing only a laminectomy. The defendants' expert refuted the opinions of the plaintiffs' expert, explaining that it was physically impossible for Dr. Rowe to have over-retracted the nerves during the discectomy due to the space in which the operation was performed and testifying that it was appropriate and within the standard of care for Dr. Rowe to have first performed the discectomy. The defense expert further opined that a possible cause of the CES was the occurrence of a spinal cord stroke during the discectomy.

The jury returned a verdict in favor of the defendants. The trial court entered judgment on the verdict, ordering that the defendants be discharged with no recovery by the plaintiffs. The Haskinses filed a motion for new trial, which the trial court denied. The Haskinses then brought this appeal.

2. *Journal article.*

While cross-examining the Haskinses' expert, defense counsel was allowed to ask him about a passage in a journal article written by partners of Dr. Rowe that concerned CES in lumbar discectomy patients and stated: "Although the origin of the condition has remained unknown, several theories have been proposed to explain the

4

underlying pathogenetic mechanism. In the vast majority of these cases, no explanation based on immediate postoperative MR imaging is usually recognized." The Haskinses contend that the trial court erred in allowing this questioning because the article was hearsay and did not fall within the hearsay exception set forth in OCGA § 24-8-803 (18), which allows the use of learned treatises established as reliable authority for cross-examination of an expert.

> However, pretermitting whether the trial court erred, any error was harmless. The new Evidence Code continues Georgia's existing harmless error doctrine for erroneous evidentiary rulings. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."). In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.

*Perez v. State*, 303 Ga. 188, 190-191 (2) (811 SE2d 331) (2018) (citation and punctuation omitted). See also *Hillman v. Aldi, Inc.*, 349 Ga. App. 432, 441 (1) (b) (825 SE2d 870) (2019) (erroneous evidentiary rulings are subject to the harmless error doctrine and where erroneously admitted evidence is cumulative of properly admitted evidence, the error is harmless).

The Haskinses argue that the use of the article was harmful because it bolstered the defense claim that a stroke may have caused the CES. But contrary to that argument, the article made no mention of stroke as a cause of CES. And to the extent the appellants are claiming that the article helped the defense by explaining why there was no stroke shown on the post-operation MRI, the article provided the same benefit to the Haskinses by supporting their expert's explanation as to why no over-retracted nerve damage was shown on the MRI. It is undisputed that the MRI performed shortly after the discectomy in this case did not show the cause of the CES; indeed, Dr. Rowe and the experts on both sides gave testimony to that effect. Under the circumstances, we find that it is highly probable that the brief questioning about the article did not contribute to the verdict. Compare *Moore v. WellStar Health System*, 349 Ga. App. 834, 845-846 (5) (824 SE2d 787) (2019) (erroneous admission of hearsay evidence that did not satisfy the learned treatise exception of OCGA § 24-8-803 (18) was not harmless where it was improperly used to impeach plaintiff's expert witness on core issue of the standard of care and to conflate certain expert witness guidelines with the standard of care issues reserved for the jury).

3. *Informed consent.*

6

The appellants contend that the trial court erred in allowing the defense to introduce evidence of the informed consent form Haskins signed before surgery. We disagree.

Haley Haskins testified on direct examination that before the surgery, Dr. Rowe had called the discectomy "simple" and had "referred to it as easy." She further testified that the day prior to surgery, she and her husband had met with Dr. Rowe, that the doctor had read something, but that they had not seen or been provided with any papers. On cross-examination, defense counsel questioned her about that meeting and whether Dr. Rowe had explained the surgery and risks in detail, showing her the informed consent form signed by her husband indicating that such information had been fully explained. She conceded that it was her husband's signature on the form, but she did not concede that the surgery and risks were fully explained, and instead responded simply that the doctor had "read something very monotone."

Thereafter, during its jury instructions, the trial court expressly charged the jury that informed consent was not a defense to the medical malpractice claims. As the court explained to the jury:

> The question of whether Mr. Haskins gave consent to the surgery in question is not to be considered by you. Informed consent is not a defense to allegations of medical negligence and does not relieve a

7

physician from the duty to exercise that degree of care or skill ordinarily exercised by the profession generally under similar conditions and like surrounding circumstances.

"A trial court's decision regarding the admission or exclusion of evidence is reviewed for an abuse of discretion." *Steen-Jorgensen v. Huff*, 352 Ga. App. 727, 732 (3) (835 SE2d 707) (2019) (citation and punctuation omitted). In this case, "[w]e find no abuse of discretion. Even though the consent form was not relevant to the issue of liability in the case, it was admissible to impeach [the witness] on her testimony that [the doctor had described the surgery as simple and had not adequately] informed [them] that there was any risk of complications connected to the surgery." *Powell v. Amin*, 256 Ga. App. 757, 762 (3) (569 SE2d 582) (2002) (finding no harmful error where evidence of informed consent admitted during cross-examination of witness and court later instructed jury that informed consent was not a defense to malpractice claims). See also *Flournoy v. Goble*, 256 Ga. App. 722, 724 (1) (569 SE2d 861) (2002).

4. *Rebuttal testimony.*

The Haskinses complain that the trial court erred in not allowing them to introduce rebuttal evidence in the form of deposition testimony of an expert witness. It appears that the trial court excluded the deposition testimony solely because the

8

expert was not identified by the plaintiffs as a rebuttal witness until after the deadline set in a scheduling order for identification of such witnesses. As our Supreme Court recently held, where a court excludes a witness "based solely upon a party's failure to meet a deadline in a scheduling order without considering any other factors, that court will have abused its discretion." *Lee v. Smith*, 307 Ga. 815, 821-822 (838 SE2d 870) (2020) (finding abuse of discretion in trial court's exclusion of rebuttal expert witness based solely on late identification of witness).

But such an abuse of discretion was harmless. The appellants contend that they were harmed because they needed the deposition testimony to rebut the defense expert's testimony that an MRI is not the "gold standard" for diagnosing a spinal stroke and that the MRI in this case might be consistent with a stroke. Pretermitting the fact that the term "gold standard" was never defined by any expert, the deposition testimony did not actually rebut the defense expert's testimony and it would have been merely cumulative of other properly admitted expert testimony.

The defense expert testified that an MRI is a good diagnostic study and shows things well; that you can see a spinal stroke on an MRI; but that an MRI is not perfect and can miss things, including a stroke. He further testified that no one knows for certain what caused the CES in this case and that an MRI is not the gold standard for

9

determining if there was a stroke because the only way to know for sure if there was a stroke would be to take a piece of Haskins' spinal cord and look at it under a microscope. He acknowledged that a stroke did not appear on the MRI done on the day of the surgery. But he noted that the Haskinses' own expert had testified that on a second MRI taken several months after the surgery, there was an enhancement of nerves which indicated that the nerves were dying. The defense expert further opined that he believed the nerves dying was consistent with his theory of a stroke.

The deposition testimony that the Haskinses sought to introduce in rebuttal was from an expert who did not testify at trial. When that expert was asked if he knew what the gold standard was for diagnosing a spinal stroke, he deposed, "Right now I would think it would be MR, but, you know, we rarely diagnose it. That's where you would start." He further deposed that neither the MRI done on the day of surgery nor the MRI done three months later showed a spinal stroke.

Contrary to the appellants' arguments, this brief deposition testimony did not address, let alone rebut, the testimony from the defense expert. As an initial matter, the defense expert's trial testimony concerning the gold standard for diagnosing a stroke was in regards to this specific case, whereas the deposed expert was making a more generalized statement. Moreover, in making such a generalization, the

10

deponent was not asked to compare an MRI to an examination of a piece of spinal cord under a microscope, as suggested by the defense expert, and he gave no opinion rebutting the defense expert's testimony that such an examination was the only way to be certain about whether there was a spinal stroke in this case. Likewise, the deponent was not asked, and gave no opinion, about whether there was an indication of nerves dying on the second MRI and whether that would be consistent with a stroke.

Additionally, the brief deposition testimony cited by the appellants was, at best, merely cumulative of trial testimony already given by the Haskinses' expert. Their trial expert testified that an MRI is a good test to show a stroke, that a stroke shows up very easily on an MRI, that if Haskins had suffered a spinal stroke it would have shown up on an MRI, and that there was no evidence to suggest any kind of stroke on either post-surgery MRI done in this case. Under these circumstances, we find no reasonable probability that exclusion of the deposition testimony contributed to the verdict since it did not actually rebut the defense expert's testimony and it "was merely cumulative of evidence that had already been presented[.]" *Armstrong v. Gynecology & Obstetrics of DeKalb*, 327 Ga. App. 737, 743 (3) (761 SE2d 133) (2014).

5. *Defense expert's testimony about stroke.*

The appellants contend that the trial court erred in allowing the defense expert to give speculative testimony that a spinal stroke was a possible cause of the CES. But the cases upon which they rely for this argument "are inapplicable here because they address only the admissibility of the testimony of [a] plaintiff's expert witnesses, i.e., what those witnesses must show in order to meet the plaintiff's burden of proving, as part of [the] case-in-chief, that the defendant's negligence caused [the] injuries." *Yang v. Smith*, 316 Ga. App. 458, 465 (1) (b) (728 SE2d 794) (2012). "This contention confuses plaintiffs' burden of proof with the defendant's burden to establish the reliability and relevance of proposed expert testimony." *Goodrich v. John Crane Inc.*, 2018 U.S. Dist. LEXIS 168355 *25 (1) (E.D. Va. 2018). "Defendants . . . do not bear the burden of proving causation. . . . [D]efendants may instead provide expert testimony suggesting alternative causes for the plaintiff's injury in order to rebut the plaintiff's specific causation testimony." *Collins v. Ethicon, Inc.*, 2017 U.S. Dist. LEXIS 204752 *5 (II) (S.D. W.Va. 2017) (citations and punctuation omitted). In this case, the appellants have failed to show that the trial court erred in allowing the defense expert's testimony suggesting an alternative cause for the CES.

6. *Excluded deposition testimony.*

The Haskinses claim that the trial court erred in not allowing them to use the deposition of a physiatrist who treated Michael Haskins after his surgery. OCGA § 9-11-32 (a) (3) provides that a party may use the deposition of a witness, whether or not a party, for any purpose if the court finds the witness is unavailable in certain circumstances. "The decision as to whether to allow the use of deposition testimony lies squarely within the sound discretion of the trial court." *LN West Paces Ferry Associates v. McDonald*, 306 Ga. App. 641, 648 (2) (b) (703 SE2d 85) (2010). Even assuming an abuse of discretion in this case, it was harmless since the witness did not give testimony regarding causation or liability, and instead testified about the nature and extent of the injuries treated. As the witness deposed, she was certified in physical rehabilitation, was not licensed to perform surgery, had no opinion about what was done during Haskins' surgery, had no criticism of the providers who had treated Haskins before his arrival at the spinal center, and had no opinion about what caused the CES.

The appellants argue that a portion of the deposition testimony contradicted the trial evidence that Haskins was able to move his feet in the operating room after the discectomy, but then could not move them later in the recovery room. The deponent,

13

however, had no personal knowledge of, and gave no testimony about, what occurred in the operating room or the recovery room. Rather, the portion of the deposition cited by appellants was merely the witness reading a spinal center admission record which said, as part of the patient's history, that the patient had experienced weakness and loss of bowel and bladder function immediately following surgery. But the witness had no knowledge about precisely when after surgery the CES symptoms first appeared; and she did not testify, let alone refute, the evidence that Haskins had been able to move his feet in the operating room after surgery.

As noted above, the witness offered no opinions about the surgery or what caused the CES, and instead was deposed about damages issues related to the extent and treatment of the injuries. Given the defense verdict finding no liability, there is no reasonable probability that exclusion of such deposition testimony contributed to the verdict since the issue of damages was not even reached. Moreover, the deposition would have been cumulative of other evidence offered at trial regarding the injuries and treatment. Under these circumstances, exclusion of the deposition was harmless.

7. *Prejudicial statements.*

While cross-examining Haskins about his testimony concerning things he could not do on his farm since the surgery, defense counsel asked, "And sometimes when you don't have help on the farm on the weekends, you have to go to, as you put it, to the black quarters to find some help, true?" The Haskinses' objected and moved for a mistrial on grounds that the question was irrelevant and prejudicial. Defense counsel argued that it was a proper cross-examination question concerning a statement Haskins had made during his deposition. The trial judge ordered defense counsel to move forward and not mention race, and defense counsel asked no further questions about the matter.

Citing OCGA § 9-10-185, the Haskinses contend that the trial court erred in failing to take further corrective action beyond directing counsel to move on from the question. That code section provides:

> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds. In its discretion, the court may order a mistrial if the plaintiff's attorney is the offender.

OCGA § 9-10-185. Here, "it [is] highly probable that the alleged error [in not taking further corrective action concerning the single unanswered question] did not

15

contribute to the judgment." *Davis v. Glaze*, 182 Ga. App. 18, 20 (2) (354 SE2d 845) (1987) (citation and punctuation omitted). Compare *Sangster v. Dujinski*, 264 Ga. App. 213, 214, 217 (590 SE2d 202) (2003) (plaintiff's attorney improperly claimed that defendant's wife had battered wife syndrome and repeatedly discussed facts not in evidence concerning defendant's prior criminal matters). With regard to a mistrial, the trial court was "vested with broad discretion, and this [c]ourt will not disturb the ruling absent a manifest abuse of discretion. In reviewing the trial court's refusal to grant a mistrial, we consider whether the remarks affected or infected the verdict, and whether it is apparent that a mistrial [was] essential to the preservation of the right to a fair trial." *Georgia Dept. of Corrections v. Crouch*, 312 Ga. App. 544, 548 (2) (718 SE2d 875) (2011) (citations and punctuation omitted). As it is not apparent that a mistrial was essential to preserve a fair trial, we find no abuse of discretion.

The appellants' further argument concerning a purported prejudicial statement about Dr. Rowe during defense counsel's closing argument provides no basis for a new trial since no such objection was made at trial. See *Doherty v. Brown*, 339 Ga. App. 567, 578 (5) (794 SE2d 217) (2016) ("To preserve a point of error for the consideration of an appellate court, counsel must take exception to the alleged error at the earliest possible opportunity in the progress of the case by a proper objection

made a part of the record.") (citation, punctuation, and emphasis omitted); *Womack v. Johnson*, 328 Ga. App. 543, 544-546 (1) (762 SE2d 428) (2014) (failure to make contemporaneous objection to allegedly improper remarks of counsel waived right to complain about remarks on appeal).

8. *Testimony of physician assistants.*

The Haskinses contend that the trial court erred in allowing two physician assistants to testify about the care that neurosurgeons typically employ and that Dr. Rowe is a good doctor. Their contentions, however, misstate the testimony given by the two witnesses, who were the physician assistants during the two surgeries performed by Dr. Rowe in this case. A review of their testimony reveals that they did not give improper opinion testimony about the typical standard of care by neurosurgeons and instead testified as fact witnesses about their personal experiences and observations working with Dr. Rowe and on the surgeries in this case. See *Glover v. Atkinson-Sneed*, 348 Ga. App. 679, 688 (1) (a) n. 6 (824 SE2d 588) (2019) (doctor allowed to testify as a fact witness); *Jim Tidwell Ford, Inc. v. Bashuk*, 335 Ga. App. 668, 671-672 (1) (782 SE2d 721) (2016) (witness may testify about observations based on personal knowledge, including the treatment of a party). Appellants have shown no reversible error in the testimony of the physician assistants.

17

9. *Deposition.*

During the trial, the deposition of one of the physician assistants discussed above was taken for use at trial because the witness lived out of state and was unavailable to testify in person. At the end of her deposition, the witness waived her right to read and sign the deposition in order to expedite preparation of the deposition transcript for use at the ongoing trial. Counsel for the Haskinses nevertheless requested that the witness read and sign her deposition. Defense counsel sought to obtain her signature before introducing the deposition at trial, but was unable to do so, and asked to be allowed to perfect the record upon obtaining the signature. The trial court allowed the deposition to be introduced at trial, ordering that the witness signature be made part of the record when completed. Three days after trial, defense counsel filed a notice indicating that the certified, signed deposition transcript had been filed. And the record contains what appears to be a certified original deposition transcript.

The Haskinses argue that the trial court erred in allowing the use of the unsigned, uncertified deposition at trial. See OCGA § 9-11-30 (e). We note that they have not identified any portion of the deposition that was used at trial as having been inaccurately transcribed or in need of correction. As previously explained, we review

18

a decision to allow the use of deposition testimony for an abuse of discretion. *LN West Paces Ferry Associates*, supra.

> In *Spector v. Lankford*, 151 Ga. App. 397, 398 (2) (259 SE2d 654) (1979), we held that the admission of a deposition at trial was proper, although it had not been made available to the witness for examination and signature. *Spector* . . . involved a unique situation where the deposition in question was taken after the court adjourned for the first day of trial[, and for the express purpose of use at trial,] because the witness had an out-of-state business commitment that prevented him from attending trial the next day, and the parties were well aware that by the time the transcript was prepared the witness would be unavailable to sign it.

*Steed v. Federal National Mortgage Corp.*, 301 Ga. App. 801, 808 (1) (c) n. 7 (689 SE2d 843) (2009) (citation and punctuation omitted). As this court explained in *Spector*:

> Since the appellant made no demand for the witness' signature until it was clear that compliance with the demand would be impossible and since there is no contention or indication that any of the testimony in the deposition was improperly transcribed, we hold that the trial court acted within its discretion in allowing the deposition to be used as evidence.

*Spector*, supra.

Likewise, in the instant case, the deposition was taken after the trial had already begun, it was taken for the express purpose of use at trial because the witness lived out of state and was unavailable to testify in person, her signature could not be

19

obtained prior to its use at trial, and there is no contention or indication that any testimony in the deposition was improperly transcribed. Moreover, it appears that a certified deposition transcript was later filed. Under these circumstances, we find no abuse of discretion by the trial court. Compare *Steed*, supra at 808 (1) (c) (court erred in admitting plaintiff's deposition for purposes of summary judgment where she had not been notified that deposition was available for her examination and signature).

*Judgment affirmed. Doyle, P. J., and Hodges, J., concur*.